UNITED STATES of America, Appellee,

v.

Allen KLEIN, Defendant-Appellant.

No. 873, Docket 78–1052.

United States Court of Appeals,
Second Circuit.

Argued May 2, 1978.

Decided July 26, 1978.

Gerald Walpin, New York City (Thomas J. DeZure, David C. Ash, Rosenman, Colin, Freund, Lewis & Cohen, New York City, of counsel), for defendant-appellant.

Thomas E. Engel, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. S. D. N. Y., Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FEINBERG and MESKILL, Circuit Judges, and PORT, District Judge.*

PORT, District Judge:

Appellant, Allen Klein, has appealed from two orders of Hon. Vincent L. Broderick, United States District Judge for the Southern District of New York, which denied a motion to dismiss the pending indictment against him, and after reargument adhered to the original ruling. Klein contends that a retrial after the sua sponte declaration of a mistrial, over his objection, by United States District Judge Charles M. Metzner [1] would violate his constitutional right not to be placed in jeopardy twice. Because our careful examination of the record convinces us that Judge Metzner, in declaring a mistrial in this case of a deadlocked jury, exercised the "sound discretion" mandated over 150 years ago by *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), we affirm.

I

The six count indictment upon which Klein was tried charged him with attempted income tax evasion for each of the years 1970, 1971 and 1972 in violation of 26 U.S.C. § 7201, and making false statements on each of the income tax returns for those years in violation of 26 U.S.C. § 7206(1). The indictment charged that the evasions and false statements arose out of Klein's failure to account for substantial cash he received from the sale of promotional phonograph records of the Beatles, whom he managed during those years. He is alleged to have received from the sale of such records $118,000, $55,000 and $52,000, respectively, for the years 1970, 1971 and 1972.

Although the case took 17 days to try, the decisive question to be resolved by the jury

---

* Hon. Edmund Port, United States District Judge for the Northern District of New York, sitting by designation.

1. Judge Metzner presided over Klein's trial. After the declaration of mistrial and the dismissal of the jury, the case was reassigned to Judge Broderick for further proceedings.

was: Should Pete Bennett,[2] the defendant's alleged accomplice, be believed?[3] If Bennett's testimony was accepted as true by the jury, then the defendant's testimony of necessity could not be.

The government's case was produced mainly through the testimony of Pete Bennett. Klein was President and Chief Executive Officer of ABKCO Industries and Bennett was ABKCO's promotion manager. ABKCO received 5,000 copies of each new Beatles' album and single from Capitol Records for promotional purposes, not for sale. Testimony indicated that, contrary to custom, these promotional records were not marked or otherwise identified as promotional copies. Bennett testified that the records were sold, according to Klein's instructions, to wholesalers and distributors. The cash was then supposedly divided between the two, the greater part going to Klein.

In addition, the government called other witnesses who claimed to have seen large sums of cash pass between Bennett and Klein. Many of these witnesses also testified to Bennett's statements which inculpated Klein by referring to the source of this cash.

Klein took the stand in his own behalf and denied Bennett's charges. He conceded

that he kept a large cash hoard in a private safe and that substantial amounts of money had passed between him and Bennett. He contended, though, that cash advances had been given to Bennett and Bennett, in turn, had merely repaid the cash advances. An accountant testified as to Klein's net worth and claimed that his investigation did not reveal the income alleged in the indictment.

A chronology of the jury proceedings from submission to discharge helps recreate the atmosphere under which Judge Metzner's decision to declare a mistrial was made. After 17 trial days, the case went to the jury on Thursday morning, November 3, 1977. Later that day, the jury requested certain exhibits and the reading of the testimony of witnesses Silver and Salvi. Their testimony was offered in corroboration of Bennett's. The testimony was read to the jury and the exhibits provided. After six and one-half hours of deliberation, the jury was sent home. The next day, the jury deliberated for the entire day, on two occasions requesting further information.

On the morning of the third day of deliberations, Klein's entire cross-examination and redirect testimony were requested and read back. Later, further testimony was asked for, including some that had already

---

2. Bennett's real name is Peter Benedetto. He has pleaded guilty to one count of a six-count indictment similar to Klein's and was awaiting sentence at the time of argument.

3. The defendant, on a number of occasions in his summation, pointed up the narrow scope to the jury:

> In my opening, I posed the issue at that time for your determination. I said then there was no dispute that promotional records had been obtained by ABKCO. There was no dispute, because Pete Bennett had admitted it, that Bennett had sold them and had obtained money.
>
> The question for your determination, I said at that time, the single issue in the trial, was did Pete Bennett give that money to Klein or did he keep it for himself?
>
> .    .    .    .    .
>
> The question in this trial comes down to: Is Pete Bennett's testimony such that you could find beyond a reasonable doubt that you believe it, that Allen Klein received this money?

.    .    .    .    .

> Klein couldn't in any logic have asked Bennett to sell these records for 35 cents each when he paid 54 cents each for them.
>
> Common sense, ladies and gentlemen, mandates a conclusion that Bennett was lying and that Bennett sold these records for himself.
>
> .    .    .    .    .
>
> Let me again summarize the evidence I have so far discussed. There is absolutely no evidence of any knowledge on Klein's part that Bennett was selling records and giving him the money, unless of course, you were to believe Bennett.
>
> This brings us back again to the simple question: In order to convict Mr. Klein, you have to believe Bennett beyond a reasonable doubt. Can you do that?
>
> .    .    .    .    .
>
> I would suggest the contrast is clear, that Bennett is a liar and cheat, while Klein is the one who has told the truth.

been reread on the first day of deliberations. Toward the end of the day, Judge Metzner proposed to counsel that a note be sent into the jury asking whether a verdict was possible or if they were hopelessly deadlocked. Both counsel objected. Defense counsel contended that such a note was uncalled for as the jury was conscientiously deliberating. He further argued that the proposed note would improperly suggest to the jury that it was deadlocked, and he requested the court to wait until the jury announced the deadlock. The government objected to the timing of the note. If the jury responded by stating it was deadlocked, the government intended to request an *Allen* charge. Accordingly, it asked that the inquiry wait until the following morning when, if necessary, an *Allen* charge could be delivered and the jury could retire forthwith for further deliberations. At 5:40 P.M. Saturday, Judge Metzner, denying a government request that the jury deliberate on Sunday, chose to do nothing and excused the jury until Monday morning at 9:30 A.M.

Monday began the fourth day of deliberations. That morning the jury requested that the court's entire charge be reread. In the afternoon, they requested, for the second time, the rereading of Silver's testimony along with other corroborative evidence. Late in the day, Judge Metzner again proposed inquiring about the chances for reaching a verdict. He noted that the issues presented to the jury were not overly complicated and contrasted the case to an SEC problem or a net worth tax case. Since the jury had already deliberated four days after a three week trial, Judge Metzner felt he was free to make this inquiry of the jury.

Defense counsel again objected to Judge Metzner's proposal, arguing that the deliberations were proceeding properly and that the judge's note was somehow coercive. The government again objected to an inquiry so late in the day since it would ask for an *Allen* charge should the jury indicate a deadlock. The defendant's counsel was not prepared to join in the request for an *Allen* charge or object to it until he con-

ferred with his client. The government further advised Judge Metzner that he must canvass the defendant for alternatives to a mistrial according to *United States v. Grasso*, 552 F.2d 46 (2d Cir. 1977), *vacated and remanded*, —— U.S. ——, 98 S.Ct. 3117, 57 L.Ed.2d 1144 (1978).

Nevertheless, Judge Metzner sent the note in. It read: "Have you reached a verdict on any count in the indictment? If not, is there a possibility that you will reach a verdict on any count in the indictment if you continue your deliberations?" The jury responded: "Some feel there is no possibility of reaching a verdict on any of the counts as we appear to be deadlocked at this point. This, however, is not unanimous." Tr. 2841; JA 406. Judge Metzner then dismissed the jury until Wednesday, allowing them time off for Election Day.

On Wednesday morning, the beginning of the fifth day of deliberations, Judge Metzner decided to give the jury a modified *Allen* charge. He discussed this with counsel but rejected each of their respective proposals, choosing to give his own modified *Allen* charge which had been approved by this court in *United States v. Tolub*, 309 F.2d 286 (2d Cir. 1962). Later, after requesting a rereading of more corroborative testimony, the jury asked the court for clarification of the meaning of corroboration. The judge discussed his response with counsel and followed some of defendant's suggestions. His instructions were then read to the jury, only to be reread an hour and a half later following another note from the jury which requested the charge in writing. Wednesday's deliberations concluded without a verdict being reached.

The next morning the jury requested, for the third time, to hear the testimony of Silver concerning exchanges of money between Bennett and Silver. At noon they asked for Bennett's testimony concerning money passing between him and Silver. After hearing nothing further from the jury for the rest of the day, Judge Metzner called counsel to chambers shortly before 5 P.M. He noted that deliberations had last-

ed for six full days and that an *Allen* charge delivered Wednesday morning had produced no results. He suggested sending a second note into the jury to inquire about deadlock. Defendant continued to press his objections. He argued that a deadlock must be unanimous. Judge Metzner rejected this contention, stating that deadlock could result, instead, when some jurors determined not to change their minds. Defense counsel's request for further instructions on corroboration was also rejected.

A note prefaced by "At the end of . . . deliberations on Monday, you informed the court that you were deadlocked in your deliberations", was sent in and the jury responded as follows:

Are you deadlocked in your deliberations? Yes.

Have you reached a verdict on any count in the indictment?

No.

If you have not reached a verdict as to any count in the indictment, is there a possibility that you can reach a verdict as to any count in the indictment?

Nine no; three yes.

The government then requested Judge Metzner to ask defense counsel, pursuant to *United States v. Grasso, supra,* for alternatives to mistrial. The court did not find *Grasso* applicable but asked for suggestions anyway. In response, defendant offered no alternatives directly, taking the position that the jury was not deadlocked because the inquiry as to the status of their deliberations was initiated by the court. Defense counsel repeated his request for a further charge on corroboration and stated that his other suggestions, those requesting a different *Allen* charge and objecting to the judge's inquiries of the jury were already on the record.

Finally, on the basis of his conclusion that the jury was hopelessly deadlocked, Judge Metzner declared a mistrial and excused the jurors.

After the case was assigned to Judge Broderick for retrial, defendant moved to dismiss the indictment, arguing that double jeopardy barred a retrial. Judge Broderick concluded that, on the facts of this case— six days of deliberation, a modified *Allen* charge, and consideration of alternatives to mistrial—Judge Metzner properly exercised his discretion in declaring a mistrial on the basis of a hung jury. He further found that neither the court nor the government in any way acted to prevent the jury from reaching a verdict. The motion to dismiss was denied. The following day defendant moved for reargument. Judge Broderick granted the reargument but adhered to his earlier decision. Defendant has appealed from both of these orders.

## II

The general principles by which the correctness of Judge Metzner's ruling must be judged were established long ago in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). Courts have the power to declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. . . . [T]he power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes" and in the exercise of "a sound discretion." *Id.* at 580. The parties do not question that a retrial, after a declaration of a mistrial meeting the *Perez* requirements, is not violative of the prohibition against double jeopardy in the Fifth Amendment. *Perez* wisely noted that "it is impossible to define all the circumstances, which would render it proper to interfere." *Id.*

Appellant Klein contends that the indictment against him should be dismissed because compelling him to stand trial after the declaration of a mistrial over his objection would place him in double jeopardy in violation of the protection afforded him under the Fifth Amendment. As *Perez* first held, and as we have stated on numerous occasions, this issue resolves itself into a question of whether or not Judge Metzner abused his discretion:

Thus, the essential question in each case involving double jeopardy contentions after the declaration of a mistrial has been whether the trial judge abused his discretion in terminating the trial short of verdict.

*United States v. Castellanos*, 478 F.2d 749, 751 (2d Cir. 1973); *see also United States v. Beckerman*, 516 F.2d 905 (2d Cir. 1975); *United States v. Goldstein*, 479 F.2d 1061 (2d Cir.), *cert. denied*, 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973). The degree of discretion to be exercised varies, however, with the circumstances creating the manifest necessity.

*Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) is instructive in evaluating whether such abuse has occurred. The Supreme Court, in reversing the affirmance of the grant of a writ of habeas corpus on double jeopardy grounds, interpreted manifest necessity to require a "high degree" of necessity to justify a mistrial. *Id.* at 506, 98 S.Ct. at 831.

The mistrial granted by the Arizona Court giving rise to the double jeopardy claim was upon motion of the prosecution and resulted from an improper opening statement by defense counsel. The court explained that the high degree standard is more easily met in certain types of cases than others. "At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence." *Id.* In these cases, the strictest scrutiny is appropriate in reviewing the finding of manifest necessity:

> At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial. The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's

interest in giving the prosecution one complete opportunity to convict those who have violated its laws.

> Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently than the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

*Id.* at 509–510, 98 S.Ct. at 832 (footnotes omitted).

The court then concluded that the case before it fell toward that end of the spectrum where the "trial judge's determination is entitled to special respect." *Id.* at 510, 98 S.Ct. at 833. In such a case, the trial judge's decision should be overruled only where a mistrial was declared irrationally, irresponsibly or precipitately. Finding that not to be the case, and in deference to "the public interest in having a just judgment reached by an impartial tribunal", *Id.* at 512, 98 S.Ct. at 834, the Supreme Court found the trial judge exercised "sound discretion" in declaring a mistrial.

Finally, the Court held that an explicit finding of manifest necessity was unnecessary. Since the record satisfactorily supported the trial court's decision, the absence of explicit findings did not make the decision constitutionally defective.

With this background in mind, we now turn to the various arguments raised by Klein, contending that the district court erred.

■ Klein urges as his initial ground for reversal that the jury was not in fact deadlocked and consequently he was deprived of the right to have his trial completed by that particular jury. His reliance on the dictionary definition of deadlock to support this contention elevates semantics above the realities of the situation confronting Judge Metzner. Since the resolution of each double jeopardy question turns on the particular facts of each case, we must examine the record to determine if, in fact, the jury at Klein's first trial was genuinely deadlocked. *See United Stated v. Goldstein, supra; United States v. Castellanos, supra.*

■ Deliberations had lasted six full days following a trial of about three weeks. The defendant's entire cross-examination and redirect testimony had been reread. Much corroborating testimony had been reread, some for a second and even a third time. The judge's entire charge had been redelivered along with further instructions concerning corroboration. Also, a modified *Allen* charge at the start of the fifth day of deliberations had produced no results. Finally, the jury itself had informed the court that it was deadlocked, first, in its own words, at the end of the fourth day and again after the sixth day of deliberations. After these developments, Judge Metzner properly exercised his discretion in finding the jury deadlocked and declaring a mistrial. We recently reiterated that, where the record reveals a deadlocked jury, the discretion of the trial court to declare a mistrial will be upheld. *Dunkerley v. Hogan,* 579 F.2d 141, 146 (2d Cir. 1978).

■ Notwithstanding this background, defendant argues that the jury was not genuinely deadlocked because the jurors were not unanimous in finding themselves deadlocked; only nine of the twelve indicated to Judge Metzner that there was no possibility of reaching a verdict. Although *United States v. Goldstein,* 479 F.2d 1061 (2d Cir.), *cert. denied,* 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973), and *United States v. Beckerman,* 516 F.2d 905 (2d Cir. 1975) suggest to the defendant that a deadlock is not reached until all twelve see no hope for a verdict, we do not agree.

This court found the declarations of mistrial in both *Goldstein* and *Beckerman* to be proper exercises of discretion on the part of the trial judges. Klein, nevertheless, by isolating certain phrases from the balance of the opinions in those cases, finds support for the rule of unanimity espoused by him. These quotes placed in proper context lend no such support.

In *United States v. Goldstein, supra,* after reversing the dismissal of the indictment on the ground that the declaration of a mistrial was consented to by the defendant, out of an "excess of caution", 479 F.2d at 1068, we dealt with the merits and held the grant of a mistrial was a proper exercise of discretion by the trial judge. In the course of reaching this conclusion, the opinion contrasted the abuse of discretion by the trial judge in *United States v. Lansdown,* 460 F.2d 164 (4th Cir. 1972), with the reasonable and appropriate exercise of discretion by the trial judge in *Goldstein.* In *Lansdown,* immediately before the mistrial was declared, the judge had been told that the jury was " 'on the verge' of a verdict" and that they "request[ed] an additional ten minutes of deliberations." *Goldstein, supra,* 479 F.2d at 1069. In *Goldstein,* the court, in the phrases relied on by Klein, pointed out that "[i]n this case, on the other hand, *no member* of the jury ever suggested that any verdict was remotely possible." *Id.* (emphasis added in appellant's brief). This comparison of the striking facts in *Lansdown* with those in *Goldstein* hardly establishes the rule of unanimity Klein seeks to impose.

The quotation from *Beckerman* is even less supportive of appellant's position. *Beckerman* also found that the declaration of a mistrial was not an abuse of discretion. The quotation is underscored and is from a footnote in which the trial judge sets out the reasons for the mistrial. These included a statement that "the Court interpreted the forewoman's statements as indicating that the jury would be unable to reach a verdict even with additional time; *no jury member declared* otherwise." *Beckerman, supra*, 516 F.2d at 909 n. 10 (emphasis added). The fact that no juror took issue with the court's unannounced interpretation of the forewoman's equivocal statement is a far cry from the proposition that the declaration of a mistrial, absent a unanimous agreement on the part of the jurors that they cannot agree, is an abuse of discretion.

In support of his argument, defendant also cites *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034 (3rd Cir. 1975) which granted habeas relief freeing defendant from a third trial following a declaration of mistrial based on deadlock. This reading of *Webb*'s holding is less than objective. *Webb* did not apply a mechanical rule requiring unanimous deadlock. In fact, the Third Circuit eschewed any "rigid application of mechanical formulae." *Id.* at 1043 (footnote omitted). The court held that no manifest necessity for mistrial existed as the trial court had never consulted with counsel prior to dismissal of the jury, and the jury had never intimated that it would be unable to reach a verdict. The mistrial was declared solely on the basis of leading questions asked the foreman by the trial judge. "[T]here is no clear showing that the foreman's responses here necessarily represented the unanimous opinion of the jury, *or even that of a majority of the panel*. The record . . . does not furnish an adequate showing that it was the *collective* sentiment of the jury that they had reached an impasse." *Id.* at 1044 (footnotes omitted) (emphasis added). The jury responses to Judge Metzner, in contrast to *Webb*, indicated that "it was the collective sentiment of the jury that they had reached an impasse." *Id.*

We have held that a trial court acted within its sound discretion in declaring a mistrial even though the trial judge questioned only the jury foreman about deadlock and did not poll the entire jury. *United States v. Beckerman*, 516 F.2d 905 (2d Cir. 1975). We have also made it clear that the finding of manifest necessity cannot be based on the simple application of any formula, *United States v. Castellanos*, 478 F.2d 749, 752 (2d Cir. 1973), and that each case turns on its own facts. Likewise, even in cases which have found that double jeopardy barred retrial, the other circuits have refused to apply any rigid formulistic rules. *See United States v. Gordy*, 526 F.2d 631 (5th Cir. 1976); *United States ex rel. Webb v. Court of Common Pleas, supra*.

"That seems to us to be the common sense of the matter; and common sense often makes good law." *Peak v. United States*, 353 U.S. 43, 46, 77 S.Ct. 613, 615, 1 L.Ed.2d 631 (1957). The best answer to appellant's argument for unanimity of disagreement is Judge Metzner's common sense response to defense counsel that

> A deadlock is two versions of approach. Some have one, others have the other . . . . [Y]ou don't need an agreement to disagree. You just need some jurors to say, "I will not change my mind." That is a deadlock.

Upholding the trial court's finding of deadlock based on the entire background of the jury's deliberations, rather than on a mechanical requirement of unanimity of disagreement, accords with the "great deference" owed the trial court under these circumstances. *Arizona v. Washington, supra*, 434 U.S. at 510, 98 S.Ct. at 833.

■ Defendant's next argument, that Judge Metzner improperly suggested to the jury that it was deadlocked, lacks support in the record. Judge Metzner's proposed original note to the jury was modified after discussion with counsel to eliminate any reference to a deadlock. A deadlock was suggested initially by the jury in its response to the first note. The second note reminded the jury they had previously re-

ported that they were deadlocked and asked if they were still deadlocked, but also asked if there was any possibility of reaching a verdict on any count. These cautious inquiries did anything but suggest an impasse to the jury. On the contrary, they kept open the possibility of reaching a verdict despite six fruitless days of deliberation.

Of the cases relied on by the defendant in which retrial after a mistrial was barred as violative of double jeopardy, only three involved hung juries. They are readily distinguishable from the circumstances confronting Judge Metzner. First, in *United States ex rel. Webb v. Court of Common Pleas, supra*, discussed earlier, the jury was discharged after less than one day of deliberations without any indication from the jury itself that it was deadlocked. The trial court acted solely on the basis of the foreman's responses to the court's leading questions. It is interesting to note that the discretion of the trial judge in declaring a mistrial in Webb's first trial was not faulted. On the fourth day of deliberations at Webb's first trial, the judge summoned the jury and made inquiries very similar to but not as innocuous as those made by Judge Metzner on the fourth day of Klein's trial. He asked the jurors "whether they were close to a verdict; whether they felt that given additional time they would be able to reach a verdict; and whether they felt themselves hopelessly *deadlocked*." *Id.*, 516 F.2d at 1035 (emphasis added). He directed his questions to the entire jury, as did Judge Metzner, both in contrast to the judge on Webb's second trial who only solicited the foreman's opinion.

In *United States v. Gordy*, 526 F.2d 631 (5th Cir. 1976), total deliberations lasted only five and a half hours and the jury had already returned a verdict on one count in the indictment. *Gordy* was the last trial of a very hectic term with sessions running late into the evening, and the record suggested that the trial judge discharged the jury so that he could catch a flight home. Finally, in *United States v. Lansdown*, 460 F.2d 164 (4th Cir. 1972), the jury was discharged despite the foreman's statement that they were on the verge of a verdict

and a juror's request for another ten minutes of deliberations.

Our analysis persuades us that these cases are inapposite. In these cases the trial judge acted "precipitately", *Arizona v. Washington, supra*, 434 U.S. at 515, 98 S.Ct. at 835, justifying appellate relief in order to protect a defendant's "valued right to have his trial completed by a particular tribunal." *Id.* at 505, 98 S.Ct. at 830. In *Klein*, Judge Metzner exercised "sound discretion", *Id.* at 514, 98 S.Ct. at 835, in declaring a mistrial, to uphold "the public's interest in fair trials designed to end in just judgments." *Id.* at 503 n.11, 98 S.Ct. at 829 n.11.

We have noted that "the 'classic example' of 'manifest necessity' is the discharge of a genuinely deadlocked jury." *United States v. Castellanos*, 478 F.2d 749, 751 (2d Cir. 1973). Since Judge Metzner properly concluded that the jury at Klein's first trial was genuinely deadlocked, we uphold his declaration of a mistrial.

### III

■ The appellant argues that a retrial is barred because of the failure of the trial court to make explicit findings that there were no reasonable alternatives to a mistrial as required by *United States v. Grasso*, 552 F.2d 46 (2d Cir. 1977), *vacated and remanded*, —— U.S. ——, 98 S.Ct. 3117, 57 L.Ed.2d 1144 (1978). The short answer to this claim is the holding of *Arizona v. Washington* that such findings are not constitutionally required.

In order to overcome this obstacle, appellant further argues that *Arizona* does not affect this court's ruling in *Grasso*. This suggestion is no longer valid in light of the Supreme Court's remand in *Grasso*. Appellant invites us to adopt the *Grasso* requirement in the exercise of our "supervisory power." We note that the Court has hardly discouraged use of such explicit findings. *See Arizona v. Washington, supra*, 434 U.S. at 514, 98 S.Ct. at 835–836. Moreover, whatever the extent of our supervisory power to require such findings after *Arizo-*

na, we would encourage their use as an aid to appellate review of the trial court's exercise of discretion. But we find it unnecessary to further analyze the question of supervisory power, because we believe that the record shows that Judge Metzner adequately considered appellant's suggested alternatives to a mistrial. Even though Judge Metzner stated that he felt *Grasso* was not applicable, at the request of the government the defense was asked to place suggested alternatives to a mistrial on the record. The response was to rely on the requested charges on corroboration and the defendant's earlier requested version of the *Allen* charge. The objection to any inquiry by the court concerning a deadlock was also repeated.

Throughout the six days of deliberations, Judge Metzner consulted with counsel on all occasions before responding to jury requests or initiating contact with the jury. When Judge Metzner first proposed asking the jury if it was deadlocked, he reworded his inquiry, on defendant's suggestion, to omit the word deadlock, and deferred the inquiry to a later date. When he recharged on corroboration, in spite of defense counsel's acknowledgment that he needed time for research and was "shooting off the top of [his] head", the judge adopted some of his suggestions. As a result of having researched the corroboration question, counsel submitted a written brief to the court before the next morning's session commenced. The judge considered it and ruled on it in the robing room, placing his reasons for denying the defendant's request on the record. The *Allen* charge given was not that requested by defendant, but neither was it the charge proposed by the government. The record clearly demonstrates consideration of all of defendant's proposed "alternatives", even if they were not ultimately adopted.

Although not cited, brief note should be taken to distinguish *Dunkerley v. Hogan*, 579 F.2d 141 (2d Cir. 1978) (2–1, Moore, J., dissenting), decided after the argument of this case. *Dunkerley* granted a writ of habeas corpus on the ground that petitioner's state court retrial was barred by the double jeopardy clause as no manifest necessity had existed for the mistrial at his first trial. The trial court had declared a mistrial sua sponte over defendant's objection when he became sick during the trial; seven to ten days hospitalization was necessary. Since the majority found that the record failed to support adequately the trial judge's action including his failure to explore any alternatives, including the simple one of a continuance, it held that no manifest necessity for a mistrial existed. Here, however, the record demonstrates that Judge Metzner considered all the proposed alternatives to a declaration of a mistrial. The "manifest necessity" for the mistrial is apparent.

The jury had been out for six full days; it had made approximately 30 requests for further instructions and testimony. It had heard crucial testimony read and reread; it had advised the court on two occasions that it was deadlocked; it deliberated for two full days after the delivery of an *Allen* charge. To have compelled further deliberations to resolve the relatively confined issue would have exhausted the jurors rather than the discussion. It is not unreasonable to join with Judge Metzner in his statement to the jury that

> there is no point in asking you to continue with your deliberations because if you haven't reached a verdict in six days, I don't think you will reach it in seven, eight, nine or ten.
>
> . . . You have worked and obviously expressed among yourselves your convictions. You certainly have reviewed the evidence in six days, as can be seen by the repeated requests for the reading of testimony, portions of the charge and exhibits. . . .

Compelling further deliberations would certainly have invited "a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Arizona v. Washington, supra,* 434 U.S. at 509, 98 S.Ct. at 832.

We do not view the necessity for a mistrial differently than did Judge Metzner. However, even if we did, under the circumstances here, we would be obliged as a reviewing court to accord "great deference" to his decision, *Id.* at 510, 98 S.Ct. at 832, and affirm Judge Broderick's orders denying dismissal of the indictment.

### IV

■ In a thinly disguised attempt to turn this appeal into a plenary review of his first trial, Klein raises a host of allegations of prosecutorial misconduct and erroneous rulings at his trial. He acknowledges that the denial of a motion to dismiss the indictment directly based on these charges is not an appealable order. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). The Supreme Court has held that the denial of a motion to dismiss an indictment on the grounds of double jeopardy is an appealable order, despite its interlocutory nature. *Id.* However, the Court also concluded that pendent claims which seek an indictment's dismissal are not reviewable short of final judgment. *Id.* at 662–63, 97 S.Ct. at 2041–2042. *See also, United States v. MacDonald*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978).

A review of the record herein demonstrates conclusively that Klein's mistrial was caused by a deadlocked jury and not by the other rulings objected to by appellant. If the rulings complained of by Klein recur at the second trial, they can "be reviewed effectively, and, if necessary, corrected if and when a final judgment results." *Abney, supra*, 431 U.S. at 663, 97 S.Ct. at 2042. The Third Circuit aptly stated in *United States v. Cerilli*, 558 F.2d 697, 701 (3rd Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977):

> Although there are claims that the prosecution has engaged in various improprieties, the fact remains that the underlying source of the mistrial was not tainted by any overreaching, prosecutorial or otherwise.

### V

Appellant urges by letter submitted after argument that the Supreme Court's recent opinion in *United States v. Scott*, —— U.S. ——, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), suggests that, whenever a trial is terminated over a defendant's objections, the double jeopardy clause bars a retrial. Appellant concedes that the facts clearly distinguish *Scott* from this case. Nevertheless, he finds the language of the opinion supportive of his claim of double jeopardy. We disagree.

Klein points out that, in overruling *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), the Court in *Scott* stressed that *Jenkins* had "placed an unwarrantedly great emphasis on the defendant's right to have his guilt decided by the first jury empanelled to try him. . . ." *United States v. Scott, supra*, —— U.S. at ——, 98 S.Ct. at 2191. Klein, however, continues to place great emphasis on the same right. *Scott* now permits a retrial after the lower court has dismissed an indictment, on defendant's motion, for reasons unrelated to guilt or innocence. The Court concluded that the defendant is "not relieve[d] . . . from the consequences of his voluntary choice", *Id.* at ——, 98 S.Ct. at 2198, in taking the case away from his first jury.

The application of the defendant's suggestion would effectively remove any discretion of the trial judge to declare a mistrial. The only declaration of a mistrial that would not run afoul of the proscription against double jeopardy would be the one to which the defendant voiced no objection. Discretion would then lie exclusively in the hands of the defendant. This is a discretion not suggested by *Scott* or any other case. Like *Jenkins*, this would place "an unwarrantedly great emphasis on the defendant's right to have his guilt decided by the first jury empanelled to try him." *Id.* at ——, 98 S.Ct. at 2191. It would completely ignore "society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Arizona v. Washington, supra*, 434 U.S. at 509, 98 S.Ct. at 832.

*Scott* in no way disturbed the ruling in *Arizona v. Washington, Id.*, decided earlier this term. *Arizona* noted that a trial court has broad discretion to decide whether manifest necessity justifies the discharge of a deadlocked jury. "[C]ourts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial." *Id.*

The orders appealed from are affirmed.