06-4195-cr
USA v. DeGennaro

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: May 16, 2007                                Decided: August 27, 2007)

Docket Nos. 06-4195-cr (Lead), 06-4198-cr (CON)
_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

TOMO RAZMILOVIC, KENNETH JAEGGI, BRIAN BURKE,

*Defendants,*

-and-

MICHAEL DEGENNARO, FRANK BORGHESE,

*Defendants-Appellants.*

_____

B e f o r e : MINER, KATZMANN, *Circuit Judges,* and MURTHA, *District Judge.*[*]

_____

---

[*] The Honorable J. Garvan Murtha, United States District Judge for the District of Vermont, sitting by designation.

Appeal from an order holding that retrial of the defendants would not violate the Double Jeopardy Clause and denying motions to bar retrial and dismiss the indictment. We hold that the decision of the trial court that there was "manifest necessity" to declare a mistrial was an abuse of discretion. Further, we hold that a statement by counsel in support of a motion for mistrial, quickly reconsidered, does not preclude the defendant from claiming that the Double Jeopardy Clause bars retrial. **REVERSED AND REMANDED**.

_____

APPEARING FOR APPELLEE:                 DAVID JAMES, Assistant United States
                                        Attorney, *of counsel,* (Eric O. Corngold,
                                        Chief Assistant United States Attorney, *of
                                        counsel*, *on the brief*) *for* Roslynn R.
                                        Mauskopf, United States Attorney for the
                                        Eastern District of New York, Brooklyn, NY


APPEARING FOR DEFENDANTS-APPELLANTS:     MICHAEL S. SOMMER (Eugene I. Goldman
                                        *on the brief*), McDermott Will & Emery
                                        LLP, New York, NY *for* Defendant-
                                        Appellant Michael DeGennaro


                                        BRADLEY D. SIMON (Brian D. Waller,
                                        Jeremy Weintraub *on the brief*), Simon &
                                        Partners LLP, New York, NY *for*
                                        Defendant-Appellant Frank Borghese

_____

KATZMANN, *Circuit Judge*:

The decision by a district court to declare a mistrial is of great consequence.

The case at hand calls on us to review such a ruling, to determine whether it was an abuse of discretion for a trial court to decide that a single jury note indicating deadlock created a "manifest necessity" to declare a mistrial. On the record before us, we conclude that it was. We therefore hold that retrial of defendants-appellants Michael DeGennaro ("DeGennaro") and Frank Borghese ("Borghese") would violate the Double Jeopardy Clause of the Fifth Amendment. We also must decide whether Borghese consented to the mistrial when he initially

2

joined in his fellow defendant's motion for mistrial but then almost immediately changed his position. We find that Borghese did not deliberately forego his right to have his guilt determined by his original tribunal.

## I.

In May 2004, DeGennaro and Borghese were named in a twenty-five count indictment charging the senior officers of Symbol Technologies, Inc. ("Symbol"), a leading manufacturer of bar code scanners, with, *inter alia*, securities fraud, mail fraud, wire fraud, and conspiracies to commit the same. DeGennaro had been Symbol's Senior Vice President of Finance. Borghese had held various positions at Symbol including Senior Vice President and General Manager of Worldwide Sales and Services. DeGennaro and Borghese were named in two of the twenty-five counts in the indictment: Count One, conspiracy to commit securities fraud, and Count Two, securities fraud.

DeGennaro and Borghese stood trial in the Eastern District of New York before Judge Leonard Wexler, along with Kenneth Jaeggi ("Jaeggi"), Symbol's former Vice President of Finance and Chief Financial Officer, who was named in twenty-three of the twenty-five counts in the indictment. Their trial, which began on January 3, 2006, lasted for six weeks and involved testimony from forty witnesses. The jury began its deliberations on the afternoon of Wednesday, February 15, 2006. The jurors were allowed to leave at 4:30 p.m. each day so that a juror could catch a 5:00 p.m. train. The jury deliberated for two days before adjourning for the President's Day weekend. During those deliberations the jury asked for read-backs of a witness's testimony

3

and a portion of the conspiracy charge.

Deliberations resumed on Tuesday, February 21, 2006. That afternoon, at 2:38 p.m., Judge Wexler announced that "[t]he jury said they need 15 more minutes. For what, I don't know." Less than ten minutes later the jury sent a note that asked "[D]oes each count require a unanimous decision?" Judge Wexler responded by sending back a note simply saying "yes." On informing the parties of the jury's note Judge Wexler commented, "I guess that's the big thing we waited for. I told you I had no idea what it was."

Court reconvened at 4:37 p.m.. Judge Wexler announced that he had a note from the jury. The noted stated in full: "Judge, We are at a dead lock. We have exhausted all our options. This has been going on since Thursday. P/S - We are ready to go home today. Thank you." [*sic*] After reading the note, Judge Wexler announced that he was going to "send them home and then I will get your opinions as to what we do." DeGennaro's counsel immediately interjected: "With instructions to have them come back tomorrow." The jurors then came into the courtroom and were sent home with instructions that they were not to discuss the case "until you are all back tomorrow."

After the jury left, Judge Wexler informed the parties that they would "continue tomorrow the same way, that's all. Unless someone wants me to declare a mistrial." Jaeggi's counsel moved for a mistrial. DeGennaro's counsel spoke next and said: "Before I make a similar application, Judge, I wonder if it makes sense to inquire of the jury if they have reached a verdict as to any defendant on any count. I would concede that the note indicates the answer is probably no."

4

Judge Wexler sought the views of the other parties. Borghese's counsel spoke first, and his response is a matter of some dispute. According to the trial transcript, he said only that he "would ask for a mistrial." Borghese's counsel claims that he said: "I request a mistrial, but I join in [DeGennaro's counsel's] application that your Honor poll the jury first to see if they have reached a verdict with respect to any of the individual defendants."[1] The Government stated that it opposed the idea of polling the jury and that it opposed the motion for the mistrial. Jaeggi's counsel also indicated that he opposed polling the jury. Judge Wexler said that he would "think about it," and following a pause in the proceedings, declared a mistrial "[i]n view of the request made by two of the defendants, and the note of the jury."

DeGennaro's counsel immediately renewed his request that the Court "at least inquire whether [the jury had] reached a verdict as to any defendant on any count." Borghese's counsel stated that he agreed with DeGennaro's counsel's position. Judge Wexler did not respond but began to discuss the scheduling of a retrial. The Government requested that Judge Wexler "hold off [his] decision in granting a mistrial." Judge Wexler responded by simply saying "No. I made it." The Government made a second request for "some opportunity to submit some arguments," but that request was also denied.

DeGennaro's counsel then asked, "I take it, your honor, that you denied my request?" Judge Wexler responded by reiterating that he had "declared a mistrial. What does that mean? You don't have to be a genius to figure that out." He also made clear that he was going to dismiss the jury: "I will not spend the money for another day. [The courtroom deputy] is going

---

[1] Borghese's counsel moved after trial to have the record changed to reflect the statement he claims he made, but that motion was denied.

to call them and the alternates and tell them that their service is over." One of the Assistant United States Attorneys asked for five minutes to consult with his office. The request was denied. When he renewed his request, Judge Wexler reluctantly granted it, but emphasized that he was unwilling to continue to discuss his decision: "But there is a mistrial. I'm now talking about what date you want to try the case."

After the break, DeGennaro's counsel again raised the possibility of polling the jury, noting that the earlier jury note had asked if they needed to be unanimous on each count. Judge Wexler responded: "Counsel, it is over. You are still arguing the point. I thought the Government wanted me to come back, and not you. Argue with your co-defendants." DeGennaro's counsel pointed out that he represented one individual and that "for all I know this jury has reached a verdict with respect to my client." Judge Wexler retorted, "If you know it, I wish you would tell me."

Borghese's counsel then stated: "For the record, Mr. Borghese opposes a motion for a mistrial, and we ask that you inquire—." He was interrupted by Judge Wexler, who reminded him that he went on record asking for a mistrial and asked, "Now you oppose a mistrial?" The following exchange then took place:

> **Borghese's Counsel**: Judge, we believe that the jury may have reached a verdict.
>
> **Judge Wexler**: Counselor, it is too late. You already said you wanted a mistrial. You can't take your plea back.
>
> **Borghese's Counsel**: I said we wanted a mistrial, but for you to inquire as to whether or not they reached a verdict.
>
> **Judge Wexler**: You didn't say that. You said you joined in with [Jaeggi's counsel].
>
> **Borghese's Counsel**: With [DeGennaro's counsel] I said.

6

**Judge Wexler**: [Jaeggi's counsel] what do you say to that? Did he join in with you?

**Jaeggi's Counsel**: I asked for a mistrial.

**Judge Wexler**: It is on the record.

**Jaeggi's Counsel**: I believe [Borghese's counsel] joined in with [DeGennaro's counsel] and I opposed them.

**Judge Wexler**: You are now saying he joined in with [DeGennaro's counsel]?

**Jaeggi's Counsel**: I believe he did.

Judge Wexler concluded the conversation by saying: "It is all over for all of you."

The next day, February 22, DeGennaro's counsel wrote Judge Wexler to inform him that overnight he had received information that the jurors had unanimously agreed that DeGennaro and Borghese were not guilty, and that the deadlock they had referred to in their note was only with respect to Jaeggi. The letter requested that the jury be recalled the next day so that a voir dire of the jury could be conducted. On February 27, the parties appeared in court. DeGennaro's counsel again asked for the jury to be recalled and polled. This time he was joined in that request by both Borghese's and Jaeggi's counsel. The request was denied. At the February 27 hearing, both DeGennaro and Borghese stated that they planned to submit motions on "the double jeopardy issue."

As they had indicated, Borghese and DeGennaro both moved to bar retrial under the Double Jeopardy Clause. The motions were denied in a Memorandum Order dated August 31, 2006. Judge Wexler found that he had "properly declared a mistrial following the jury's unambiguous note that it was genuinely deadlocked," and therefore, that the Double Jeopardy Clause did not bar retrial. This appeal followed.

7

## II.

The Double Jeopardy Clause of the Fifth Amendment prevents the Government from putting a defendant in jeopardy twice for the same offense. U.S. Const. amend. V, cl. 2. "The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal." *Arizona v. Washington*, 434 U.S. 497, 503 (1978). This prohibition reflects a "constitutional policy of finality" in the criminal context, *United States v. Jorn*, 400 U.S. 470, 479 (1970) (plurality opinion), and is a principle that is "deeply ingrained in . . . the Anglo-American system of jurisprudence." *Green v. United States*, 355 U.S. 184, 187 (1957).

Because jeopardy attaches when the jury is empaneled and sworn, *Corey v. Dist. Court of Vt., Unit #1, Rutland Circuit*, 917 F.2d 88, 90 (2d Cir. 1990), the protections afforded by the Double Jeopardy Clause include "the defendant's valued right to have his trial be completed by a particular tribunal." *Washington*, 434 U.S. at 503 (internal quotation marks omitted). Even when a first trial is not completed, a second prosecution may be "grossly unfair" because it "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Id.* at 503-04 (footnotes omitted).

Despite the importance of this right, retrial "is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused." *Id.* at 505. As Justice Harlan explained:

> [A] mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide. . . . [A] defendant's

8

valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.

*Jorn*, 400 U.S. at 480 (internal quotation marks and citation omitted). The Double Jeopardy Clause thus operates as a limit on the power of the trial court to require a defendant to stand trial a second time following a mistrial; retrial is permitted only when the original decision to declare a mistrial was compelled by "manifest necessity." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824). The manifest necessity standard reflects a recognition that a criminal trial is "even in the best of times, a complicated affair to manage," *Jorn*, 400 U.S. at 479-80, and that a rule that barred retrial whenever an appellate court saw the need to declare a mistrial differently would create undesirable pressures on trial judges to see each trial through to completion, *Washington*, 434 U.S. at 509-10.

We review the decision of a trial court that there is manifest necessity to declare a mistrial for abuse of discretion. *United States v. Klein*, 582 F.2d 186, 191 (2d Cir. 1978). The discretion afforded a trial judge in declaring a mistrial is, of course, not boundless. As Justice Stevens observed in *Washington*, "a constitutionally protected interest is inevitably affected by any mistrial decision. . . . [R]eviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial." 434 U.S. at 514.

"[T]he classic example of manifest necessity is the discharge of a genuinely deadlocked jury." *United States v. Castellanos*, 478 F.2d 749, 751 (2d Cir. 1973) (internal quotation marks omitted). The term "genuinely deadlocked" suggests more than an impasse; it invokes a moment where, if deliberations were to continue, "there exists a significant risk that a verdict may result

9

from pressures inherent in the situation rather than the considered judgment of all the jurors." *Washington*, 434 U.S. at 509; *see also United States v. Goldstein*, 479 F.2d 1061, 1068 (2d Cir. 1973) ("Requiring a jury to continue deliberations despite genuine and irreconcilable disagreement more often than not defeats the ends of public justice; not only will such compulsion needlessly waste valuable judicial resources, it may coerce erroneous verdicts.").

We grant particularly broad discretion in reviewing the determination by a trial judge that there is manifest necessity for a mistrial due to a genuinely deadlocked jury. *Washington*, 434 U.S. at 510. We recognize that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate," *id.* at 510 n.28, and that when faced with a deadlocked jury, the trial judge must delicately balance the defendant's "valued right to have his trial completed by a particular tribunal" and "the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949).

"Since the resolution of each double jeopardy question turns on the particular facts of each case, we must examine the record to determine if, in fact, the jury at [the defendant's] first trial was *genuinely* deadlocked." *Klein*, 582 F.2d at 192 (emphasis added). We thus turn to the record to determine if it supports the trial judge's conclusion that he was confronted with a genuinely deadlocked jury and, therefore, that there was a manifest necessity to declare a mistrial.

While it is well established that this area of the law "abjures the application of any mechanical formula," *Illinois v. Somerville*, 410 U.S. 458, 462 (1973), there are several factors that we consider in reviewing the determination that a jury was genuinely deadlocked. Because of the fact-intensive nature of the inquiry, these factors are not exhaustive; instead they represent

10

useful guideposts for our review of the trial court's determination.

First, we consider statements by the jury that it cannot agree. *See United States v. Vaiseta*, 333 F.3d 815, 818 (7th Cir. 2003); *Jones v. Hogg*, 732 F.2d 53, 56 (6th Cir. 1984). Such statements include both jury notes indicating deadlock and also statements made directly to the trial judge by the jury. *Cf. United States v. Horn*, 583 F.2d 1124, 1129 (10th Cir. 1978) (noting that trial court had received jury note indicating that jury was unable to agree but had not directly discussed with jury whether they could reach agreement before declaring a mistrial). As the Seventh Circuit has observed: "[B]ecause the state of jury deliberations is ever-changing, prior evidence of deadlock is not always dispositive of a jury's present inability to reach a unanimous verdict. . . . [W]hen the record does not contain a statement by the jurors themselves that they cannot agree, review of the district court's exercise of its discretion is more difficult." *United States v. Byrski*, 854 F.2d 955, 962 (7th Cir. 1988); *see also United States v. Gordy*, 526 F.2d 631, 636-37 (5th Cir. 1976) (finding that record was insufficient to determine that "no verdict could be reached," despite statement by foreman that jury was "hung," because no dialogue "was developed with jurors individually" and it could not be said with certainty that further deliberations "would have proved futile").

Second, we consider the length and complexity of the trial. *See Vaiseta*, 333 F.3d at 818; *Fay v. McCotter*, 765 F.2d 475, 477 (5th Cir. 1985); *Jones*, 732 F.2d at 56. Factors that may affect the complexity of the trial include the number of counts and the number of defendants. *See Byrski*, 854 F.2d at 963 ("The trial was complex and lengthy, involving seven defendants and multiple charges against each defendant."). Third, we consider the amount of time that the jury has deliberated, a factor generally related to the length and complexity of the trial. *See id.* at 963

11

("Although the length of the jury's deliberation was not excessive considering the complexity and length of the trial, neither was it so insubstantial as to cast doubt on the correctness of the judge's mistrial declaration."). Fourth, we consider the impact that further, forced deliberations might have on a possible verdict. *See Vaiseta*, 333 F.3d at 818; *Jones*, 732 F.2d at 56; *Arnold v. McCarthy*, 566 F.2d 1377, 1387 (9th Cir. 1978). In considering this factor, we are particularly cognizant of the possibility that "[c]oercion of an already exhausted jury to continue deliberations may induce jurors to accommodate a verdict which they would not otherwise support." *Arnold*, 566 F.2d at 1387; *see also Byrski*, 854 F.2d at 963 ("A court must also consider the effects of the jury's possible exhaustion and the impact coercing further deliberations might have had on the verdict.").

Finally, we consider what actions, if any, the trial judge took prior to declaring a mistrial to help it determine whether the jury was genuinely deadlocked. *Jones*, 732 F.2d at 56 & n.1; *Harris v. Young*, 607 F.2d 1081, 1085 n.4 (4th Cir. 1979) ("One major factor to consider in assessing the wisdom of the trial court's action is whether a mistrial was necessary. If obvious and adequate alternatives to aborting the trial were disregarded, this suggests the trial judge acted unjustifiably."); *see also Dunkerley v. Hogan*, 579 F.2d 141, 148 n.7 (2d Cir. 1978) ("[W]e cannot approve the declaration of a mistrial when the record does not indicate that the mistrial was manifestly necessary, in light of the relatively brief interruption in the trial . . . and the availability of another alternative to the mistrial declaration."). As part of this analysis, we consider alternatives that the district court chose not to pursue, recognizing that a trial court must be mindful of the possibility that any action it chooses to take might coerce a verdict. The decision not to pursue any particular alternative is usually within the discretion of the trial judge

12

and the decision not to take any action at all is not necessarily an abuse of discretion.  As we have repeatedly observed, "'[p]er se rules are inappropriate in the mistrial context, and every case turns on its own facts.'"  *MacQueen*, 596 F.2d at 82 (quoting *Drayton v. Hayes*, 589 F.2d 117, 122 (2d Cir. 1979)).

Applying these considerations to this record, we are not persuaded that the jury was genuinely deadlocked when the trial court declared a mistrial.  The single piece of evidence in the record that supports the trial judge's conclusion is the twenty-nine-word note from the jury that it was "at a deadlock" and had "exhausted all [its] options."  The trial judge did not discuss the extent of the deadlock referred to in the note with the members of the jury and did not ask them whether there was any chance that further deliberations might produce a verdict.  The trial had lasted for six weeks.  The trial judge himself described it as "complex."  The jury was considering twenty-one separate counts against three defendants, and heard testimony from forty witnesses.  Despite the substantial length and complexity of the trial, the jury had only deliberated for three full days when the mistrial was declared.  There is no evidence from the record that further deliberations would have risked producing a verdict that the jurors would not have otherwise supported.  This was not a case where the jury had been asked to engage in marathon deliberations or where there were other indications that suggested a likelihood of a coerced verdict.

Finally, there were a number of actions that the trial court could have taken short of declaring a mistrial, including instructing the jury to continue its deliberations, *see, e.g.*, *MacQueen,* 596 F.2d at 79; polling the jury to determine whether it had reached a verdict on any count, *see United States v. Joyner*, 201 F.3d 61, 83 (2d Cir. 2000); giving the jury an *Allen*

13

charge, *see Allen v. United States*, 164 U.S. 492 (1896); *United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir. 1991) (reaffirming use of *Allen* charge); and instructing the jury about the possibility of reaching a partial verdict, *see United States v. DiLapi*, 651 F.2d 140, 147 (2d Cir. 1981). There is nothing in the record that suggests why the use of any of these options would have created a risk that the jury would reach a verdict that would not reflect its "considered judgment." *Washington*, 434 U.S. at 509. We do not suggest that the trial court had to pursue any of these options, but the decision not to pursue any of them without any evidence in the record as to why further action would have been inappropriate is a factor that we consider in assessing whether the trial judge abused his discretion.

The failure to pursue any of the alternatives also sets this case apart from other cases where we have upheld trial courts' determinations to declare a mistrial due to a genuinely deadlocked jury. *See United States v. Williams*, 205 F.3d 23, 36 (2d Cir. 2000) (mistrial declared only after trial judge was told by jury for fourth time that it could not reach a verdict);[2] *Joyner*, 201 F.3d at 83 (finding manifest necessity where trial judge gave *Allen* charge and polled jury before discharging it); *White v. Keane*, 969 F.2d 1381, 1382-83 (2d Cir. 1992) (per curiam) (finding manifest necessity where trial judge gave *Allen* charge before receiving deadlock note and then after receiving note, polled the jury, and asked directly whether it was possible to reach a verdict); *MacQueen,* 596 F.2d at 82 (finding manifest necessity where, in multi-defendant,

---

[2] Though it was not discussed in our opinion, the Government's trial brief in *United States v. Williams* noted that the trial court not only told the jury to continue deliberating the first three times that it indicated it was unable to reach a verdict but also gave the jury supplemental instructions "urging them to attempt to reconcile their differences of opinion if possible but cautioning them not to abandon their views merely to achieve unanimity." Brief and Appendix for the United States at 70, 71, *United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) (No. 99-1327).

multi-count trial, after receiving note that jury had reached verdict on some counts, trial judge first sent jury back for more deliberations then delivered modified *Allen* charge before declaring mistrial); *Klein*, 582 F.2d at 189-90, 192 (finding manifest necessity where, after initial note indicating deadlock, jury was read an *Allen* charge, sent back for another day of deliberations and asked in a note from the trial judge whether they had reached a verdict on any count and whether, if a verdict had not been reached, it was possible for them to reach a verdict on any count); *United States v. Beckerman*, 516 F.2d 905, 908 (2d Cir. 1975) (affirming trial judge's conclusion that jury was deadlocked where trial judge spoke to jurors and asked whether "with a little more time you feel you might be able to reach a verdict" and construed defendant's silence as agreement that sufficient time had passed).[3]

Before concluding that record evidence suggests that the trial court abused its discretion in determining that the jury was genuinely deadlocked, we consider any explanation offered by the trial court for its decision. While a trial judge is not constitutionally mandated to explain the decision to declare a mistrial if "the record provides significant justification," *Washington*, 434 U.S. at 516-17, when we are unable to discern from the record that a jury was genuinely deadlocked, a trial judge's explanation, elaborating on the decision to declare a mistrial, can aid

_____

[3] We decline DeGennaro's invitation to adopt a *per se* rule for multi-defendant cases requiring the trial court, before discharging a jury, to conduct an "in-person inquiry of the jury to verify that the deadlock is intractable and that further deliberations would be of no use," as the appellants suggest that the Ninth Circuit has done. *See Arnold v. McCarthy*, 556 F.2d at 1387 ("Upon receiving a communication from the jury stating that it cannot agree, the trial court must question the jury to determine independently whether further deliberations might overcome the deadlock."). As we already have noted, the fact that a trial involves multiple defendants is appropriately considered in determining whether a jury was genuinely deadlocked, but while the step of polling the jury may be a reasonable step, that determination is properly left to the sound discretion of the trial judge.

15

our inquiry.

Here we do not have the benefit of any such elaboration. When the issue of a mistrial first arose, the parties were given an opportunity to state whether they supported or opposed a mistrial, but they were not given the opportunity to discuss the issue or to present arguments to the court. The trial judge then made his initial decision relying on "the request made by two of the defendants, and the note of the jury." The post-trial opinion does not offer any further insight; instead it only reiterates the one thing the record already makes clear, that the trial judge received a note from the jury stating that it was "at a deadlock." In these circumstances, where the record does not indicate that there was genuine deadlock, and the court has not provided an explanation for its conclusion or pointed to factors that might not be adequately reflected on a cold record, we are unable to satisfy ourselves that the trial judge exercised "sound discretion" in declaring a mistrial. *Perez*, 22 U.S. at 580. We therefore conclude that the protections afforded by the Double Jeopardy Clause bar the retrial of DeGennaro and Borghese.

### III.

When a defendant moves for or consents to a mistrial, the Double Jeopardy Clause usually imposes no bar to retrying that defendant. *United States v. Huang*, 960 F.2d 1128, 1133 (2d Cir. 1992). "The reason for allowing a retrial in such circumstances is that when the defendant requests a mistrial, he is deemed to have deliberately elected to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *Id.* (internal quotation marks omitted). By focusing on whether a defendant elected to forego that right, we seek to

16

ensure "that the defendant retain primary control over the course to be followed in the event of [judicial or prosecutorial] error." *United States v. Dinitz*, 424 U.S. 600, 609 (1976). The Government contends that Borghese deliberately elected to forego his right to have his case proceed before his first jury when his counsel initially joined in Jaeggi's motion for a mistrial. We disagree.

While the record indicates that Borghese initially joined in Jaeggi's motion, within seconds of the trial court declaring a mistrial Borghese stated that he joined in DeGennaro's request that the jury be polled before any decision on the mistrial was finalized. We view the immediacy with which Borghese clarified his position as significant. The trial record reflects that the moments following the receipt of the jury note indicating deadlock were marked by confusion and uncertainty. To begin with, the parties were asked to state their positions on a mistrial within a few minutes of hearing about the jury's note and within seconds of the possibility of a mistrial being raised. After the mistrial was declared, the parties were still trying to come to grips with what had taken place and to figure out their positions.[4] The Government requested that the court "hold off [its] decision declaring in granting the mistrial" so it could "submit some arguments," and then asked for a five minute break "before the Court takes any action" so it could "consult with [its] office." DeGennaro continued to press his request that the

---

[4] While the Government originally opposed a mistrial, it now contends that the jury's note "left no room for doubt" that it was at a deadlock, and argues that the "contemporaneous reaction of the government attorneys . . . does not support any particular interpretation of the note, or any position on the necessity for a mistrial." We agree that the Government is not bound by its initial position on the decision to declare a mistrial, but we note a degree of tension in the Government's suggestion that while the initial reaction of its attorneys to the jury note should be completely disregarded, the initial reaction of Borghese's counsel was sufficiently considered to constitute a deliberate election to forego a valued right.

17

jury be polled and seemed to suggest at one point that there was still time to ask the jury if further deliberations would allow it to reach a verdict.[5] In short, Borghese's change of position seems to reflect a harried period in which all the parties were struggling to formulate their positions in response to the unexpected turn of events.

Borghese's change of position also had legal significance — the decision to declare a mistrial is not irreversible until the jury has been discharged. *See Camden v. Circuit Court of the Second Judicial Circuit*, 892 F.2d 610, 616 n.7 (7th Cir. 1989) ("While the mistrial declaration alone was not a talismanic utterance, the discharge and dispersal of the jury rendered the mistrial a *fait accompli.* Once the jury is discharged and has dispersed, a trial court is unable to reconsider its intention to declare a mistrial."); *United States v. Smith*, 621 F.2d 350, 352 n.2 (9th Cir. 1980) ("Until the jury was actually excused, the court might have reconsidered its intention to declare a mistrial."); *see also United States v. Estremera*, 531 F.2d 1103, 1109 (2d Cir. 1976) (affirming verdict where defendant moved for a mistrial, it was granted, the defendant then withdrew the motion, and the case was resumed). While the adamancy of the statements of the trial judge following his initial mistrial declaration suggest that he understood his decision to be final, the decision was by no means irreversible given that the jury had already been sent home with instructions to return the next day. It was not unreasonable for Borghese to believe that the trial judge, who had relied in part on the request of the "two defendants" in declaring that mistrial, might still reconsider that decision once Borghese's position was clarified.

Because Borghese's statement that he joined in DeGennaro's request that the jury be

---

[5] DeGennaro's counsel was cut off by the Court while making this statement.

polled (before the decision to declare a mistrial was finalized) was both immediate and was made while the trial court could still have changed its decision, we believe Borghese cannot be said to have deliberately foregone his right to have his guilt determined by his original tribunal.

## IV.

For the reasons set forth above, we hold that the retrial of both DeGennaro and Borghese is barred by the Double Jeopardy Clause. The August 31, 2006, Order of the district court is **REVERSED**, and we **REMAND** for further proceedings consistent with this Opinion.