

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-5-2008

# USA v. Cyril H. Wecht

Precedential or Non-Precedential: Precedential

Docket No. 08-2258

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Cyril H. Wecht" (2008). *2008 Decisions.* Paper 457.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/457

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-2258

———

UNITED STATES OF AMERICA

v.

CYRIL H. WECHT,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 06-cr-00026-001)
District Judge:  Honorable Arthur J. Schwab

———

Argued August 4, 2008
Before:  SMITH, FISHER
and VAN ANTWERPEN, *Circuit Judges*.

(Filed: September 5, 2008)

David R. Fine (Argued)
K&L Gates
17 North Second Street
18th Floor
Harrisburg, PA  17101

Jerry S. McDevitt
Mark A. Rush
K&L Gates
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA  15222

Richard L. Thornburgh
K&L Gates
1735 New York Avenue, N.W.
Suite 500
Washington, DC  20006
        *Attorneys for Appellant*

Mary Beth Buchanan
Robert L. Eberhardt
Rebecca R. Haywood (Argued)
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA  15219
        *Attorneys for Appellee*

---

OPINION OF THE COURT

2

FISHER, *Circuit Judge*.

This appeal presents questions of both factual and legal significance. Factually, we write yet another chapter in the ongoing appellate saga surrounding the criminal prosecution of Dr. Cyril H. Wecht, a renowned former county coroner whose name and face have appeared in the media over the past several decades. Legally, we decide issues surrounding one of the most rooted and basic of our Constitution's guarantees of individual liberties: the right not "to be twice put in jeopardy of life or limb" for the same offense. U.S. CONST. amend. V.

I.

The facts of Wecht's celebrated past and more recent criminal charges are amply described in our previous opinions deciding interlocutory appeals in this matter. *See United States v. Wecht*, 484 F.3d 194, 197-98 (3d Cir. 2007) (*Wecht I*); *United States v. Wecht*, --- F.3d ----, 2008 WL 2940375, at *1 (3d Cir. Aug. 1, 2008) (*Wecht II*). We therefore need not dwell on those facts here.

We pick up the story on January 28, 2008, when trial began after a week of jury voir dire proceedings. At issue were forty-one counts of theft from an organization receiving federal funds, and wire and mail fraud. After twenty-three trial days, on March 17, 2008, counsel delivered closing arguments, and the District Court instructed the jury. Among its many instructions was the following:

> "The number of offenses charged is not evidence of guilt and should not influence your decision in any way. You must separately consider the evidence that relates to each charge, and you must return a separate verdict for each offense.
>
> For each offense charged you must decide whether the government has proven beyond a reasonable doubt that the defendant is guilty of that particular offense.
>
> Your decision on one offense, whether guilty or not guilty, should not influence your decision on any of the other offenses charged. Each offense should be considered separately."

The jury began its deliberations on March 18, 2008.

The following week, on March 27, 2008, the jury sent the District Court a note that read: "Out of the 41 counts if any one or more count the jury cannot come to unanimous agreement on, does that constitute a hung jury?" The District Court consulted with counsel and, with their consent, sent the following written response to the jury:

> "The answer to your question is 'no.' It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial

4

consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."

Another week later, on Thursday, April 3, 2008, the jury sent a note to the District Court, which included the following language:

"After considering all counts in a variety of ways and in reconsideration of all individual opinions according to the court instructions – we have unanimously agree [sic] we have reached an impasse & respectfully request direction from the court. We agree additional deliberation would not be helpful."

The District Court read and showed this note to counsel and told them that it was inclined to poll the jurors individually to ask whether they were "hopelessly deadlocked" and whether further deliberations would lead to a unanimous verdict, and then to read to the jury Instruction 9.05 of the Third Circuit's model criminal jury instructions (Instruction 9.05).

After informing counsel of its intentions, the District Court allowed them time to consider the issue. After counsel

deliberated, the Government suggested to the District Court that it send to the jury a note asking if it could reach a unanimous verdict on any of the counts because "the Government is not convinced that the jury understands or perhaps is apprised that a partial verdict is a possibility." The Government then suggested that, if the jury responded that it could not reach a partial verdict, the District Court should then give Instruction 9.05, but not conduct individual polling.

Defense counsel objected to the Government's proposed course of action. He suggested instead that the District Court bring the jurors into the courtroom and poll them individually, but if each expressed that additional deliberations would not break the deadlock, that the Court declare a mistrial and discharge the jury.

The District Court decided to do what it had originally suggested. Accordingly, it had the jurors return to the courtroom. It polled them individually, asking the following two questions: (1) "Do you agree that the jury is hopelessly deadlocked?"; and (2) "Do you believe that further deliberations would not lead to a unanimous verdict?" Each responded to both questions affirmatively, i.e., that he or she believed the jury to be hopelessly deadlocked and that additional deliberations would not be helpful. The District Court then read Instruction 9.05 to them:

> "Members of the jury, I am going to ask you to return to the jury room and deliberate further. I realize that you are having some difficulty reaching unanimous agreement, but that is not

unusual.  And often after further discussion, jurors are able to work out their differences and agree.

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.  Listen carefully to what the other jurors have to say, and then decide for yourself if the government has proved the defendant guilty beyond a reasonable doubt.

What I have just said is not meant to rush or pressure you into agreeing on a verdict.  Take as much time as you need to discuss things.  There is no hurry.

With that instruction, I will return you to the jury room.  Thank you."[1]

---

[1]We have quoted Instruction 9.05 as it appears in our model criminal jury instructions.  What the District Court

7

The District Court then sent the jurors back to deliberate, which they did for an additional twenty minutes that day.

After the jurors left the courtroom, the Government renewed its request that the District Court ask the jurors collectively if they could reach a partial verdict. The District Court denied the request. After formal proceedings recessed, the Government filed a motion requesting for the third time that the District Court give the jury a partial verdict instruction. In a written filing on April 4, 2008, Wecht's counsel objected to the proposed instruction and cross-moved for a mistrial. He gave the following reason for mistrial:

> "[T]he defense respectfully moves for the discharge of the jury and declaration of a mistrial in light of the jury's unqualified individual declarations that they are hopelessly deadlocked and that further deliberations would not lead to unanimous verdicts. Indeed, requiring a jury to continue deliberations despite genuine and irreconcilable disagreement more often than not defeats the ends of public justice; not only will such compulsion needlessly waste valuable judicial resources, it may coerce erroneous verdicts."

---

actually read to the jury does not differ from the model in any material way.

Later that day, the District Court denied the Government's partial verdict instruction request, but did not at that time address the defense motion for a mistrial.

On Monday, April 7, 2008, after the jury resumed its deliberations for the first time since the prior Thursday, the District Court entered an order denying Wecht's written motion for a mistrial. The jury deliberated for four hours on that day.

Shortly before 9:00 the next morning, April 8, 2008, the District Court clerk telephoned counsel and entered the following on its docket: "Counsel for the Government and Defense and all parties are hereby ORDERED to appear today, 04/08/08 at 9:15 AM." Neither the telephone call nor the electronic notice described the purpose for which counsel were summoned.

At 9:20 a.m. on April 8, 2008, with the jury present, the District Court opened the proceeding as follows:

"THE COURT: Good morning. Thank you all for gathering pursuant to the notice on the Electronic Case Filing system.

For your and the jury's safety and the preserved good order, I would ask that you follow the following instructions this morning:

Everyone should remain in their seats throughout this proceeding from now until when the jury and I exit the courtroom.

9

No one will be permitted to be running in and out of the courtroom as happened last week.

Secondly, I expect everyone to be quiet, and if anyone wants to make motions or objections to this proceeding or whatever, they may do so in writing on ECF, as we have done throughout the trial.

If anyone is unwilling to abide by these instructions, I will give you time now to exit.

Thank you for your assistance and cooperation.

The jury has informed the bailiff that they remain hopelessly deadlocked and are unable to reach a unanimous verdict on the defendant's guilt on any of the 41 counts and are unable to reach a unanimous verdict on the defendant not being guilty of any of the 41 counts.

The jurors' note will be marked as Court Exhibit 13, and I have copies thereof, which you can pick up when we're done with this proceeding, which has deleted the names of presumably the foreperson and secretary.

The names of the jurors have not been released pursuant to my Order of Court. Until the

10

Third Circuit determines otherwise, that will remain in effect.

Thus, defendant is still charged with each of the 41 counts with the constitutional presumption of innocence as to each of the 41 counts.

It is the government's responsibility to decide whether or not to retry the defendant.

Does the government have a decision today whether the government will retry the defendant?

[GOVERNMENT]: We do, Your Honor, and we will.

THE COURT: I would ask that by Friday at noon that the government file a notice as to which of the counts, which could be as few as one or as many as the 41, which of the counts will be tried in the retrial. Is the government prepared to proceed immediately to retry the case?

[GOVERNMENT]: We are, Your Honor.

THE COURT: Is the defense prepared to immediately retry the case?

[DEFENSE]: We will have several motions to make before that happens.

THE COURT: Okay. Just for everyone's scheduling purpose, I will set the trial for May 7th – excuse me – May 27th, which is the day after Memorial Day, May 27, 2008, at nine a.m.

That should give defense and the government sufficient time to file whatever motions they wish to respectively file. On behalf of the defendant, when would you like to file any motions you wish to file, sir?

[DEFENSE]: I will need some time to think about that. This is quite a surprise.

THE COURT: Okay. I know everyone needs a little rest, so I appreciate that matter. I would ask the defense, if you would kindly for me, please file any motions you have by noon on April 18, 2008.

If you find after reflection that date doesn't work for you, then just file an appropriate motion, and I will work with you in that regard.

I will send out a scheduling order as to the May 27th, 2008 date without prejudice to whatever defendant's motions will come before me.

12

> Before I declare a mistrial and discharge the jury, I wish to express several things.
>
> First of all, I want to thank our wonderful court reporters . . . ."

After thanking various court personnel and the jurors, the District Court stated: "I declare a mistrial. I discharge the jury and the alternate jury . . . ." The jury note to which the District Court referred but which, as indicated, was not shown to counsel until after the jury was already discharged, stated in its entirety:

> "Pursuant to court instructions the jury contends we have exhausted all further deliberation efforts. We agree unanimously that we are unable to reach a unanimous verdict – on all 41 counts and are essentially deadlocked in the case of United States of America vs. Cyril H. Wecht."

On Monday, April 14, 2008, Wecht filed a motion to dismiss the indictment and preclude the Government from further prosecution in violation of the Double Jeopardy Clause of the Fifth Amendment. The Government responded on April 17, 2008. The District Court denied the motion on April 29, 2008.

In its twenty-one-page order denying the motion, the District Court offered a number of rationales. First, the District Court reasoned that, because Wecht had moved for a mistrial the previous week, he is deemed to have consented to the declaration of mistrial on April 8, 2008. Second, the District

13

Court asserted that Wecht consented to the mistrial because, during the April 8, 2008 proceeding, his counsel did not object to the mistrial. Third, the District Court concluded that "it cannot be seriously disputed that the jury was hopelessly deadlocked, and that, therefore, manifest necessity required declaration of a mistrial and discharge of the jury."

That same day, Wecht filed a notice of appeal to this Court from the order denying dismissal of the indictment. Wecht also filed a motion in the District Court seeking a stay of the retrial pending appeal. The District Court denied that motion on May 2, 2008, writing in its fifteen-page order that Wecht's appeal to the Third Circuit was "frivolous" and that he was seeking "to delay these proceedings." Wecht then filed an emergency motion for a stay in our Court, which we granted on May 8, 2008.

## II.

We have jurisdiction over the District Court's order denying Wecht's motion to dismiss the indictment on double jeopardy grounds under the collateral order doctrine. *Abney v. United States*, 431 U.S. 651, 659 (1977). Whether retrial is permitted in accordance with the Double Jeopardy Clause depends on whether the first trial has ended with a properly declared mistrial. *United States v. Rivera*, 384 F.3d 49, 54 (3d Cir. 2004). The degree of deference we accord to the District Court's mistrial declaration varies depending on why the Court reached the decision, as well as whether it exercised sound discretion in reaching it. *See Arizona v. Washington*, 434 U.S.

14

497, 507-10 & n.28 (1978).  We will explore these degrees of deference later in the opinion.  *See* III.C, *infra*.

III.

**A.     The Ideal**

We begin by discussing the hallmark of sound discretion in this area:  the procedures that district courts should follow prior to declaring a mistrial based on a deadlocked jury.  *See United States v. Dixon*, 913 F.2d 1305, 1311 (8th Cir. 1990) ("What we seek is assurance on the record that the district court, in declaring a mistrial, acted responsibly and deliberately, and accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." (internal quotation marks omitted)).  We find useful the Third Circuit's model criminal jury instruction 9.06, approved in January 2007, which consists not of a jury instruction, but of the following comment (Comment 9.06):

> "If the jury indicates that it is still deadlocked after the court has given instruction 9.05 (Deadlocked Jury – Return for Deliberations), the Committee recommends the following procedure be followed and recorded.
>
> *First*, to determine whether a supplemental charge is necessary, the court should question the foreperson, but must take steps to ensure that the foreperson does not reveal either the numerical split on the jury or the position of the majority.

15

*See United States v. Fiorilla*, 850 F.2d 172, 175 (3d Cir. 1988); *Government of Virgin Islands v. Romain*, 600 F.2d 435 (3d Cir. 1979). For example, the court may address the foreperson as follows:

> 'Advise me of the status of deliberations. If the jury is divided, I do not want to know the numbers or the direction. I only want to know whether in your judgment there is a reasonable probability that the jury can arrive at a unanimous verdict in this case if sent back for further deliberations.'

*Second*, if the foreperson indicates that the jury is deadlocked, the court should question each juror, asking 'Do you agree that there is a hopeless deadlock which cannot be resolved by further deliberations?'

*Third*, if jurors' answers reflect that they are deadlocked, the court should excuse the jury and hold a hearing with counsel and the defendant. The court should elicit the positions of all the parties, taking particular care to get a record of the position of the defendant(s) and defense counsel on whether to declare a mistrial. If the court declares a mistrial that is not required by manifest necessity, the Double Jeopardy

16

Clause will bar a retrial of the case unless the defendant consented to the mistrial. *See United States v. Dinitz*, 424 U.S. 600 (1976); *United States v. Rivera*, 384 F.3d 49 (3d Cir. 2004). When the defendant does not consent to the mistrial, the courts consider a number of factors to determine whether the mistrial represents an abuse of discretion and whether it bars further prosecution:

1. a timely objection by the defendant;

2. the jury's collective opinion that it cannot agree;

3. the length of jury deliberations;

4. the length of the trial;

5. the complexity of the issues presented to the jury;

6. any proper communications between the judge and jury;

7. the effects of exhaustion and the impact of coercion of further deliberations on the jury.

*See* [citation].

17

If the court concludes that a mistrial is necessary, the court should make an explicit finding of manifest necessity. For example, the court may state:

> 'Based on an evaluation of the following factors (state factors relevant to case), I find that the jury is unable to reach a verdict, that further deliberations would be futile, and that there is no alternative but to declare a mistrial for reasons of manifest necessity and to dismiss the jury.'

> *Fourth*, the court should call the jury back into the courtroom and discharge the jurors."

Today we hold that district courts in our Circuit should follow the above procedure prior to declaring a mistrial based on a deadlocked jury. We use the word "should" instead of "must" because the orderly process of jury deliberations rests in the discretion of the trial judge, and we do not wish to bind his hands without regard to the factual and procedural history in any individual case. *See United States v. Trala*, 386 F.3d 536 (3d Cir. 2004) ("it is well-established that [a district court] has broad discretion to determine how long jury deliberations should continue"), *vacated on other grounds*, 546 U.S. 1086 (2006). We also note that some of our sister circuits have interpreted the Supreme Court's precedent in *Washington* to hold that "the trial judge does not have to make an explicit finding of 'manifest

18

necessity' or expressly state that particular alternatives were considered and rejected." *Dixon*, 913 F.2d at 1311.

Again, we do not turn Comment 9.06 into a mandate, but, all else being equal, a district court's explanation of its decision on the record helps the parties, this Court on appeal, and the district court itself in its exercise of sound discretion. *See id.* As such, we believe that there are few situations in which the procedure outlined in Comment 9.06 would not be the most desirable one to follow. Thus, it should be followed in cases involving a mistrial declaration based on a deadlocked jury.

In addition, district courts must follow Federal Rule of Criminal Procedure 26.3, which provides:

> "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives."

Here, we use the word "must" because the Rule itself uses that word. We note further that Comment 9.06 states that "[t]he court should elicit the positions of all the parties" in the third step of its outlined procedure. We do not equate that recommendation in Comment 9.06 with the mandate in Rule 26.3 because doing so would attach a precise time stamp to Rule 26.3 when its text merely states, "[b]efore ordering a mistrial." At the same time, district courts should be mindful to follow Rule 26.3 at a sensible moment, which often will be one that is

19

closer to the actual moment in which a mistrial is declared. We will explain why shortly. *See* III.B, *infra*.

We have therefore summarized the ideal set of procedures – Comment 9.06 combined with Rule 26.3 at an opportune moment – to be followed by district courts when faced with the decision to declare a mistrial leading to the discharge of a deadlocked jury.

## B.    The Violation

The District Court here did not follow the ideal set of procedures as we have outlined in the previous subsection. It is clear that, after the jury indicated that it was still deadlocked after receiving Instruction 9.05 in full, the Court did not follow Comment 9.06. It did not question the foreperson, poll the jurors individually, or "hold a hearing with counsel and the defendant" outside the presence of the jury; it performed those actions before giving Instruction 9.05. The sequence matters because each time Instruction 9.05 or a similar supplemental charge is given, the jury deliberates further, and any progress that is made during those additional deliberations might be unaccounted for when the trial judge then declares a mistrial precipitously. By following Comment 9.06 just prior to declaring a mistrial, the trial judge ensures that those additional deliberations are reflected in his decisionmaking.[2]

_____

[2]It appears that the District Court gave Instruction 9.05 partially on March 27, 2008 in response to the jury's question pertaining to partial verdicts, and then gave it fully on April 3, 2008 in response to the jury's first expression of deadlock. It

20

Further, the District Court did not "make an explicit finding of manifest necessity," under the seven factors listed in the third step of Comment 9.06, prior to calling the jurors back into the courtroom and discharging them. The Court's ex post order on April 29, 2008 comes far too late to serve to comply with Comment 9.06 when a mistrial was declared back on April 8, 2008. Still, because today's decision leaves Comment 9.06 as a recommendation instead of turning it into a mandate, we do not state that the Court "violated" Comment 9.06.

Federal Rule of Criminal Procedure 26.3, however, is another matter. Despite the District Court's proclamation that "[t]here can be no doubt, on the record before this Court, that over a five day period, this Court fully and faithfully complied with Fed. R. Crim. P. 26.3 in letter and in spirit," we find on the present record that the Court did indeed violate the Rule. We repeat that the Rule's text states only that a court must consult with counsel "[b]efore ordering a mistrial." The Court here did so consult before ordering a mistrial, specifically on April 3, 2008.

But April 3, 2008, was five days prior to when the District Court actually declared the mistrial. On the one hand, we could interpret "before ordering a mistrial" literally as any time (no matter of what duration) before ordering a mistrial, but

_____

could be argued, then, that the District Court followed much of Comment 9.06 after it gave the partial Instruction 9.05. But the ideal, nonetheless, would have been for the District Court to follow all of Comment 9.06 after giving the full Instruction 9.05 and the jury again expressing deadlock.

21

doing so would effectively render the Rule a nullity. The 1993 Advisory Committee Notes to the Rule state, inter alia:

> "The Rule ensures that a defendant has the opportunity to dissuade a judge from declaring a mistrial in a case where granting one would not be an abuse of discretion, but the defendant believes that the prospects for a favorable outcome before that particular court, or jury, are greater than they might be upon retrial."

Thus, consulting with counsel too early (and never doing so again prior to declaring mistrial), albeit within the literal text of the Rule, is not consistent with the spirit and purpose of the Rule. This is so because whether "the prospects for a favorable outcome" are greater in counsel's view depends on the full panoply of factual and procedural information available to counsel just prior to mistrial declaration, rather than well before that when counsel does not yet have that information. In sum, intervening events might change trial strategy, such that, when a trial judge follows Rule 26.3 too early, the corresponding hearing or consultation fails to represent the parties' position as accurately as it would were Rule 26.3 followed at a moment closer to the actual mistrial declaration.

The question then, is whether, in light of the present record, the District Court violated Rule 26.3 by "following" it too early. We answer this question in the affirmative. It was laudable for the District Court to consult with counsel as to what it should do after the jury's first note expressing deadlock. Nevertheless, too many intervening events transpired between

22

that moment and the ultimate mistrial declaration for the Court to rely on its initial compliance with Rule 26.3 as satisfying its obligation to follow the Rule for all intents and purposes until the jury's discharge. The intervening events included: (1) giving the jury Instruction 9.05 on a Thursday, (2) twenty minutes of additional deliberation that day, (3) recessing the jury for the weekend, (4) four additional hours of deliberation on the following Monday, and (5) a second jury note expressing deadlock phrased differently from the first. These intervening events heightened the possibility that counsel would have different views or arguments to make had the District Court consulted with them again after the events.

Moreover, the record in this case indicates that, when the District Court received the first jury note of deadlock on April 3, 2008, it had no intention to declare a mistrial at that time. In fact, it had already expressed to counsel its intention to poll the jurors individually and give them Instruction 9.05 before defense counsel requested a mistrial. The consultation that the District Court had with counsel on that date, therefore, was not pursuant to Rule 26.3, that is, designed to elicit counsel's views with respect to the propriety of a mistrial; rather, the consultation was a tangential one designed (1) to inform counsel of the first jury note expressing deadlock, and (2) to elicit their views as to how to respond to the note. Had defense counsel not asked for a mistrial at that juncture, that outcome might not have figured in the consultation at all.

Without the ability to resort to its conduct on April 3, 2008, the District Court has no basis on which to aver that it followed Rule 26.3 "fully and faithfully . . . in letter and in

23

spirit." This is so because the District Court did not come close to following Rule 26.3 at the April 8, 2008 proceeding. First, it did not show or read to counsel verbatim the second jury note until after mistrial was already declared. Second, it explicitly instructed counsel "to be quiet, and if anyone wants to make motions or objections to this proceeding or whatever, they may do so in writing on ECF, as we have done throughout the trial." Third, it announced the new development and its corresponding intentions in the jury's presence.[3] At no time during that proceeding did the District Court solicit counsel's views as to the propriety of the impending mistrial declaration. The lack of information to counsel rendered difficult their ability to make an informed decision; the effective gag order rendered difficult any attempt by counsel to urge the District Court to follow Rule 26.3 at that time; and the fact that this all occurred in the jury's presence rendered difficult the ability of defense counsel to object or even ask for a sidebar, for fear that the jury would blame the defense for prolonging its term of service.

## C.    The Remedy

Our finding that a Federal Rule of Criminal Procedure has been violated does not, however, answer the question of what the remedy is for the violation. Wecht has moved to

---

[3]We are well aware that the District Court would have needed the jury in the courtroom to conduct polling, but the record is abundantly clear that the District Court had no intention of polling the jurors or following any other portion of Comment 9.06 or Rule 26.3 on April 8, 2008, other than simply discharging the jury.

24

dismiss the indictment. Insofar as the motion is based on an alleged violation of the Double Jeopardy Clause caused by a retrial, we will address that argument shortly. But we must first reject Wecht's contention that the indictment must be dismissed merely because the District Court violated Rule 26.3.

"The federal criminal rules are not constitutional imperatives. . . . They are procedural only." *United States ex rel. Gaugler v. Brierley*, 477 F.2d 516, 523 (3d Cir. 1973). We reaffirmed this principle a year later in *United States v. Hall*, 505 F.2d 961 (3d Cir. 1974), in which we held that a violation of Federal Rule of Criminal Procedure 41(d), which mandated that the officer executing a search warrant properly inventory the property taken,[4] did not automatically result in the suppression of that property as evidence. 505 F.2d at 963. We explained that the irregularity in the officer's inventory procedure in that case was "not 'constitutionally significant' under the Fourth Amendment." *Id.* Although Rule 41(d) "outlines detailed procedures, it does not expressly address the remedies, if any, which flow from a failure to adhere to those procedures." *Id.* "[W]e do not believe that it was intended that every violation of the procedures in the rule, however insignificant and however lacking in consequences, should give rise to the remedy of suppression." *Id.* at 964.

Like Rule 41(d), Rule 26.3 contains no textual indication of what the remedy for any violation should be. In *United States v. Berroa*, 374 F.3d 1053 (11th Cir. 2004), the Court of Appeals for the Eleventh Circuit discussed this precise question and

---

[4]Rule 41(d) has since been amended.

acknowledged that it was the first court of appeals to do so. *Id.* at 1056. Despite the district court's violation of Rule 26.3, the court of appeals found that the Rule "is not designed to change the substantive law governing mistrials." *Id.* (quoting 1993 Advisory Committee Notes). It then held that a violation of the Rule "is one factor to be considered in determining whether a trial judge exercised sound discretion" in declaring a mistrial. *Id.* at 1058-59. Notably, the court declined to hold that a violation of the Rule requires dismissal of the indictment to avoid a violation of the Double Jeopardy Clause. We agree that a violation of Rule 26.3 does not always mean that a mistrial was declared improperly as a matter of constitutional law, and accordingly hold that the remedy for a violation of Rule 26.3 is not automatically the dismissal of the indictment.

We thus proceed to explore the main issue raised in this appeal: whether, under the substantive law governing mistrials, the indictment against Wecht must be dismissed because the District Court improperly declared a mistrial. *See Rivera*, 384 F.3d at 54. "[I]t has long been held that the declaration of a mistrial sua sponte by a trial court does not automatically bar a future trial for the same offense." *Crawford v. Fenton*, 646 F.2d 810, 816 (3d Cir. 1981). The Double Jeopardy Clause permits retrial following a mistrial when, "taking all the circumstances into consideration, there is a manifest necessity for the [mistrial]." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824).[5] "The question of whether 'manifest necessity' existed

_____

[5]The analysis is different when the defendant consents to a mistrial. *See Love v. Morton*, 112 F.3d 131, 133 (3d Cir. 1997). At oral argument the Government conceded that Wecht

26

in the case before us is a mixed question of law and fact over which we exercise plenary review." *Rivera*, 384 F.3d at 55. At the same time, where a mistrial is "premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial[,] . . . [t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court." *Washington*, 434 U.S. at 509-510.

"The realities of litigation preclude a precise definition of 'manifest necessity'." *Rivera*, 384 F.3d at 55. Facts that might demonstrate manifest necessity include a hopelessly deadlocked jury, juror bias, and the unavailability of a prosecution witness. *Id.* at 55-56, 57. The Supreme Court has made it clear that appellate scrutiny decreases when the mistrial is based on a deadlocked jury, rather than the absence of a witness:

> "[T]he strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.
>
> . . .
>
> At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to

did not consent to the mistrial in this case, so we proceed only under the "manifest necessity" analysis.

reach a verdict, long considered the classic basis for a proper mistrial. The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws.

Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his 'valued right to have his trial completed by a particular tribunal.' But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the 'necessity' for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious

> societal consequences of an erroneous ruling,
> would employ coercive means to break the
> apparent deadlock. Such a rule would frustrate
> the public interest in just judgments."

*Washington*, 434 U.S. at 508-10.[6]  In other words, while manifest necessity is ultimately a legal issue over which we exercise plenary review, we accord considerable deference to a district court's judgment as to the existence of a deadlocked jury that manifestly necessitates a mistrial.

Here, the stated reason for mistrial was a deadlocked jury; we therefore turn to the record to determine whether it supports the District Court's conclusion that the jury was hopelessly deadlocked. Although the question of manifest necessity "abjures the application of any mechanical formula," *Illinois v. Somerville*, 410 U.S. 458, 462 (1973), the following non-exhaustive, fact-intensive factors aid our appellate review

---

[6]The difference in deference depending on the reason for mistrial shows why Wecht should not analogize his case entirely to our decision in *Rivera*. Although it articulates binding legal principles, *Rivera* is based on facts bearing little resemblance to those in this case. There, the district court declared a mistrial because of frequent delays, interruptions, and juror inactivity occasioned by the unavailability of the Government's key witness due to a leg injury. We held that the mistrial was improperly declared, emphasizing that "[w]hat makes this declaration . . . particularly troubling is that it was due to the absence of a prosecution witness." 384 F.3d at 57.

of the District Court's determination of manifest necessity in the context of deadlocked juries:

"1.     a timely objection by the defendant;

2.     the jury's collective opinion that it cannot agree;

3.     the length of jury deliberations;

4.     the length of the trial;

5.     the complexity of the issues presented to the jury;

6.     any proper communications between the judge and jury;

7.     the effects of exhaustion and the impact of coercion of further deliberations on the jury[;]

8.     whether the court provided counsel an opportunity to be heard;

9.     whether the court considered alternatives to a mistrial; and

10.    whether the court's decision was made after adequate reflection."

30

Comment 9.06 (factors one through seven); *United States v. Byrski*, 854 F.2d 955, 961 (7th Cir. 1988) (factors one through seven); *United States v. Brown*, 426 F.3d 32, 36-37 (1st Cir. 2005) (factors eight through ten); *see also United States v. Razmilovic*, 507 F.3d 130, 137-39 (2d Cir. 2007) (all ten factors). Again, our enumeration of these factors is meant to guide district courts and our appellate review in a clear fashion; we do not mean to suggest that all factors are relevant in all cases or that some other appropriate consideration might not animate a district court's determination.

We address each factor in turn, beginning with factors eight through ten because they focus on the District Court's procedures (and hence sound discretion) in rendering its decision and impact the degree of deference we otherwise would accord under *Washington*. We note preliminarily that factor eight mirrors Rule 26.3, and we equate them for purposes of this discussion. Next, we already have stated that the District Court fell short of the ideal with respect to its decisionmaking process; not only did it ignore Comment 9.06, it also violated Rule 26.3. But we have also held that these failures do not automatically result in the remedy of dismissal of the indictment. In *Berroa*, the Eleventh Circuit explained:

> "Although Rule 26.3 now mandates that which was previously strongly advised, the failure to hear from the parties has invariably been a factor to be considered when applying the manifest necessity test. Consistent with the adoption of Rule 26.3, a trial court's failure to hear from the parties remains as one of several factors to be

31

considered in determining whether the trial court exercised sound discretion. Consistent with the manifest necessity test, the extent to which a Rule 26.3 violation indicates a lack of sound discretion must be considered and resolved based upon the individual and varying circumstances of each case. As Rule 26.3 mandates that a trial court provide the parties an opportunity to be heard, the failure to comply with that mandate necessarily creates a strong suggestion that a trial judge did not exercise sound discretion."

374 F.3d at 1058; *see also Rivera*, 384 F.3d at 56 ("[t]he dialogue fostered by Rule 26.3 ensures that only those mistrials that are truly necessary are ultimately granted"); *United States v. Bates*, 917 F.2d 388, 396 (9th Cir. 1990) ("trial courts are much more likely to have exercised sound discretion when they listen to the parties before declaring a mistrial").

Today we hold, in accordance with our sister circuit, that a violation of Rule 26.3 lessens the degree of deference we accord to a district court's finding of manifest necessity. Under *Washington*, we generally give the highest degree of deference to a district court's judgment that a deadlocked jury manifestly necessitates a mistrial. 434 U.S. at 508-10. But "the deference accorded the trial judge's finding of manifest necessity can disappear, even in the classic case of a hung jury, when the trial judge has not exercised sound discretion." *Berroa*, 374 F.3d at 1057 (citing *Washington*, 434 U.S. at 510 n.28). Exactly how much deference is lessened is not an exact science: we still are much more likely to sustain a mistrial declaration based on a

32

genuinely deadlocked jury than on any other basis, but our review will be somewhat more rigorous when we perceive procedural flaws in a district court's decision.

Our deference to the District Court's determination of manifest necessity in this case is further decreased by factors nine and ten – whether the court considered alternatives to a mistrial and whether it made its decision after adequate reflection. *See Bates*, 917 F.2d at 396 ("A trial court's abrupt declaration of a mistrial suggests that it failed to exercise sound discretion."). Although the District Court gave Instruction 9.05 as an alternative to mistrial on April 3, 2008, it did not consider whether it might be fruitful to give it or another supplemental instruction again on April 8, 2008. We acknowledge that it is possible that the District Court might have considered alternatives or given additional reflection to the matter in its subjective mind. But we decline to credit these private thoughts – assuming arguendo that they existed – under factors nine and ten of our review when they do not manifest themselves on the record. *See id.* at 395 ("Determining that a mistrial was proper and retrial permissible because reversal was certain is an objective, not subjective, inquiry to be based on the record as it existed at the time of the mistrial.").

Some loss of deference due to district court procedures indicative of a lack of sound discretion, however, does not necessarily mean that there was no manifest necessity to declare a mistrial as a matter of substantive fact. *See Brown*, 426 F.3d at 37 ("The overarching question on appeal is whether the district judge's declaration of a mistrial was [manifest]ly necessary under all the circumstances." (internal quotation

33

marks omitted)).  As we previewed in the jurisdictional section of this opinion, *see* II, *supra*, our standard of review is impacted by a district court's exercise of sound discretion.  A district court still could have come to a correct conclusion based on the record facts; we simply elevate our appellate scrutiny when a district court violates Rule 26.3 or makes other significant procedural errors in reaching that conclusion.

This is precisely what happened in *Berroa*.  There, the defendant appealed the district court's allegedly improper declaration of a mistrial under procedural circumstances similar to the case at bar.  The defendant was tried on various drug, firearm, and conspiracy charges.  374 F.3d at 1055.  After a day or so of deliberations, the jury sent a note to the district court stating:  "We have agreed on some counts.  However, we are unable to come to a decision on others."  *Id.*  At that point (May 29th), the district court consulted counsel for all parties and then gave a modified *Allen* charge (akin to our Instruction 9.05), and the jury continued its deliberations.  *Id.*  A day later (May 30th), the jury informed the court:  "We again have made some decisions.  However we can not [sic] come to an agreement on others."  *Id.*  The district court declared a mistrial on each of the undecided counts, without providing the parties an additional opportunity to comment or recommend alternatives, as required by Rule 26.3.  *Id.*

In analyzing whether this procedural history exhibited manifest necessity for a mistrial, the Court of Appeals for the Eleventh Circuit stated:

34

"[T]he events leading to the decision to declare a mistrial were not rapid, and we cannot say that the trial judge's decision was precipitous. Without dispute, after receiving the jury's note on the afternoon of May 30 declaring that it could not agree on some counts, the district court convened counsel and the jury, took the verdict and immediately declared a mistrial as to the other counts. Significantly, before declaring the mistrial, the district court consulted neither the defense attorneys nor the government.

The events of the afternoon of May 30, however, do not stand in isolation. The jury's note on that date was the second such note from the jury. In response to the first note, sent on May 29, the court gave the jury a modified *Allen* charge. Additionally, the second note was not sent shortly after the jury began deliberations, but on the third day of deliberations and the day after receiving the modified *Allen* charge. Considered as a whole, the circumstances reveal that the court's decision was not an abrupt, precipitous response to a single note from the jury, but was a deliberate decision made subsequent to three days of deliberations, a prior note declaring an inability to agree, and the jury's prior receipt of a modified *Allen* charge.

. . .

35

On balance, we find that the district court erred in failing to consult with the parties prior to declaring a mistrial after receiving the second note from the jury stating its inability to reach a decision. While this error weighs in favor of a finding that the trial judge did not exercise sound discretion, the remainder of the record is to the contrary. Accordingly, we find that the trial judge exercised sound discretion and defer to his finding of manifest necessity to declare a mistrial."

*Id.* at 1059-60. The facts relevant to manifest necessity in our case – two jury notes, the district court's consultation with counsel after the first jury note but violation of Rule 26.3 after the second jury note – parallel *Berroa* almost exactly. Therefore, our own analysis of manifest necessity appropriately conforms with *Berroa*'s.

Returning, then, to the Comment 9.06 factors that aid in our appellate review of a district court's finding of manifest necessity, we do not believe that the first factor – a timely objection by the defendant – carries much weight in this case. On the one hand, it was Wecht who argued rather vigorously for a mistrial on April 4, 2008, explaining that his written motion was filed "in light of the jury's unqualified individual declarations that they are hopelessly deadlocked and that further deliberations would not lead to unanimous verdicts." On the other hand, we have already explained why the District Court's course of action on April 8, 2008, rendered difficult the ability of defense counsel to object at that time. Hence, the first

36

"manifest necessity" factor of whether the defendant timely objected does not weigh in favor of or against a mistrial.

What carries far more weight in this case is the second factor: the jury's collective opinion that it cannot agree. Here, we have two notes expressing jury deadlock.[7] The first note – and Wecht's motion of April 4, 2008 confirms this interpretation – clearly expresses that the jury was hopelessly deadlocked and that no additional deliberations would help the jury reach a unanimous verdict on any of the counts. *See Byrski*, 854 F.2d at 962 (earlier determination by district court that additional deliberations would be helpful "does not, however, expunge the record of all prior evidence of deadlock," when prior notes sent by jury indicated deadlock). Wecht argues on appeal that the second note expressing jury deadlock detracts from, rather than reaffirms, the first note. We disagree.

In this regard, Wecht argues first that the jury might have been close to a verdict because the second note uses the phrase "essentially deadlocked" rather than "hopelessly deadlocked." However, we are unwilling to hold the jury to Webster's Dictionary's precise definition of adverbs and thereby read a material distinction between "essentially" and "hopelessly," or more specifically, that "essentially deadlocked" might somehow

_____

[7]Even more accurately, we have three such notes. The jury's March 27, 2008 note, though phrased as a question about hung juries, already hinted at the emergence of an impasse. For the sake of clarity, however, the remainder of the discussion in the principal text will refer to the April 3, 2008 note as the first note and the April 7 (or 8), 2008 note as the second note.

37

indicate an imminent break in the deadlock. *See United States v. Vaiseta*, 333 F.3d 815, 819 (7th Cir. 2003) (defendant's "'might have' argument, without any evidence that his rights and interests were compromised by the declaration of a mistrial, cannot prevail against the specific facts and circumstances of this case"). We thus doubt that the jury intended to water down its expression of deadlock by using a different adverb in the second instance. Instead, any clear movement toward a unanimous verdict between the two notes is perceptible only if one reads the second note in a highly counterintuitive manner.

Second, Wecht argues that the second note states that the jury was unable to reach a verdict "on all 41 counts," which implies that it could reach or was close to reaching a verdict on some subset of those counts. We believe that the likelihood of this misunderstanding is low. The District Court's March 27, 2008 response to the jury, which stated that the inability to reach a unanimous verdict on only some of the counts does not constitute a hung jury, should have cleared up any confusion, especially in light of the Court's abundantly clear partial verdict instruction on March 17, 2008.[8] Even assuming arguendo that any confusion lingered, we simply do not agree that it offsets the jury's repeated expression of genuine deadlock.

We move on, then, to the third through fifth factors dealing with the length and complexity of trial and length of deliberations, noting preliminarily that "[t]here is no uniform minimum period during which a jury must deliberate before the

---

[8]We further note that Wecht himself had objected vigorously to a partial verdict instruction on April 3 and 4, 2008.

court may declare a hung jury." *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034, 1044 (3d Cir. 1975). Here, the trial lasted for twenty-three days, and the jury deliberated for a total of 54.5 hours over a period of ten days. On the one hand, the issues were relatively complex in that there were forty-one counts. On the other hand, there was only one defendant. *See Byrski*, 854 F.2d at 963 ("Although the length of the jury's deliberation [approximately thirty hours over thirteen days] was not excessive considering the complexity and length of the trial [seven defendants and multiple charges against each defendant tried for thirty-two days over an eight-week period], neither was it so insubstantial as to cast doubt on the correctness of the judge's mistrial declaration.").[9] We believe that, on this record, the amount of deliberation time corresponded sufficiently to the length and complexity of the trial, such that

[9]We contrast our case, for example, with the Second Circuit's decision in *Razmilovic*, in which the court barred retrial. There, the district court decided "that a single jury note indicating deadlock created a 'manifest necessity' to declare a mistrial." 507 F.3d at 133. Also, the jury had deliberated for only three days after a six-week trial involving three defendants, twenty-one separate counts, and forty witnesses. *Id.* at 139. There was also no individual polling of jurors. *Id.* By stark contrast, the District Court here received two jury notes, polled the jurors individually after the first, and gave them Instruction 9.05 after nine days of deliberation over one defendant after a six-week trial. There was then an additional half-day of deliberation on April 7, 2008. This completely different record does not contain facts akin to the ones that prompted the Second Circuit to reverse in *Razmilovic*.

these factors weigh in favor of the District Court's finding of manifest necessity.

The sixth factor – any proper communications between the judge and jury – also weighs in favor of the District Court's finding because the Court individually polled the jurors, asking whether they were "hopelessly deadlocked," and each juror confirmed what the collective note stated. Although the timing of this polling was not ideal, *see* III.B, *supra*, the District Court nonetheless performed it at a sufficiently informative juncture to reveal that each juror believed that further deliberations would not help him in reaching a unanimous verdict. The issuance of Instruction 9.05 also constituted a proper communication from the judge back to the jury (as well as an alternative to mistrial) to give the jury one more opportunity to reach a unanimous verdict. *See United States v. Joyner*, 201 F.3d 61, 83 (2d Cir. 2000) (proper mistrial declaration following protracted deliberations, *Allen* charge, and polling of jurors, even though defendants claimed that they "were not given the opportunity to be heard on the issue"); *United States v. Simpson*, 94 F.3d 1373, 1377 (10th Cir. 1996) (proper mistrial declaration following jury's repeated expression of deadlock and jury foreman's confirmation, even though "the court did not provide the parties with a hearing on the necessity of a mistrial"). The communications between the District Court and the jurors both individually and collectively thus buttress the conclusion that the eventual second note expressing jury deadlock represented a genuine deadlock that could not be broken.[10]

---

[10]As for the seventh factor relating to the danger of a coerced verdict, we need not dwell on it. There was obviously

In sum, the record as a whole in this case supports the District Court's conclusion that there was "manifest necessity" to declare a mistrial without Wecht's consent. As a result, the District Court may retry Wecht without violating the Double Jeopardy Clause, and so it did not err in denying Wecht's motion to dismiss the indictment.

IV.

Our holding today that there is no constitutional bar to retrying Dr. Wecht does not stand for the proposition that he must be retried. That is a decision that rests with the Government. Indeed, Wecht's prosecution is one that already has spanned more than thirty months. It has resulted in numerous appeals and emergency motions to this Court and, with the filing of this opinion, three lengthy precedential opinions.

If the Government chooses to proceed with a retrial, our view is that both sides and the interest of justice would benefit

---

a possibility that the jury might be coerced into a verdict had it been sent back for further deliberations. Yet, the District Court made no finding to this effect on the record, and we do not presume to know how exhausted the jury was at the point of mistrial declaration. Again, had the District Court made explicit findings for each factor under Comment 9.06, we would be in a much better position to assess this factor. Nonetheless, as in *Berroa*, the balance of the factors, even under a less deferential standard of review, weigh strongly in favor of the District Court's finding of manifest necessity.

from a reduced level of rancor in the courtroom, fresh eyes on the case, and fewer forays to this Court by the parties, including intervening parties. This has been a highly charged, lengthy, and complex case involving serious criminal charges brought against a prominent public figure. The trial judge has been the referee in a heavyweight fight, and, as we have ruled, has generally made the correct calls, with some exceptions. *Wecht II*, for example, noted that the District Court initially failed to follow our mandate from an earlier order. *See* --- F.3d at ----, 2008 WL 2940375, at *1 n.1. And in today's decision, even though there was manifest necessity to declare a mistrial in satisfaction of the Fifth Amendment, the District Court reached that conclusion through a highly flawed set of procedures. *See* III.B, *supra*.

Therefore, in the exercise of our supervisory powers under 28 U.S.C. § 2106, *see*, *e.g.*, *Gov't of the Virgin Islands v. Walker*, 261 F.3d 370, 376 (3d Cir. 2001), *see also Liteky v. United States*, 510 U.S. 540, 554 (1994), we will direct that Judge Schwab be relieved of further duties on this case and that the Chief Judge of the District Court assign a new judge to handle any future matters in the case including any retrial. Although we tread cautiously because "[t]he decision to remove a judge from an ongoing trial should be considered seriously and made only rarely," *Huber v. Taylor*, 532 F.3d 237, 251 (3d Cir. 2008), this case has progressed so unusually as to become sui generis. *See*, *e.g.*, *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 372-73 (9th Cir. 2005) (concluding under 28 U.S.C. § 2106 that, even absent allegations of bias, because of the highly unusual procedures the trial judge employed, "the appearance of justice requires

42

reassignment on remand"); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 37 (2d Cir. 1988) (concluding "that it is necessary to remand the case to a different district judge" because court of appeals was "disturbed by the manner in which the district court treated this case on our initial remand").

We thus end this chapter in the Wecht appellate saga by coming full circle. In *Wecht I*, the issue of whether Judge Schwab should be recused for bias figured prominently in the appeal. In that opinion our dissenting colleague concluded under 28 U.S.C. § 455 "that another judge should preside over the trial of Wecht." 484 F.3d at 236 (Bright, J., dissenting).[11] As we have just described, the problem today is not so much the appearance of bias as it is the appearance of litigation at a combative tenor that likely will not abate were Judge Schwab to stay on the case. We therefore direct that a less invested adjudicator take over from here.

V.

For the foregoing reasons, we will affirm the District Court's order denying Wecht's motion to dismiss the indictment. We nonetheless will exercise our supervisory power

---

[11]Certainly Wecht should be pleased with our reassignment of the case. Not only did he move for Judge Schwab's recusal at issue in *Wecht I*, he did so again under § 455 in the form of a petition for writ of mandamus to our Court, which we denied on January 2, 2008. Wecht then moved for recusal again under § 455 more recently on April 21, 2008. Judge Schwab denied the motion on May 8, 2008.

43

and remand this case to the Chief Judge of the District Court to reassign the case to a different judge.